[No. B158338. Second Dist., Div. Five. Aug. 14, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT FRANK STERN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. through III.C.

COUNSEL

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Margaret E. Maxwell and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TURNER, P. J.—**

## I.  INTRODUCTION

In another case, defendant, Scott Frank Stern, stabbed an unidentified man during a fight in Hollywood. The Hollywood stabbing was not charged in this case. The Hollywood stabbing occurred several days before defendant made a threatening telephone call to the victim in this case, Kevin Hird. During the telephone call, defendant threatened the lives of Mr. Hird's family. Defendant also threatened to kill Mr. Hird. Additionally, defendant threatened to slit Mr. Hird's mother's throat. Mr. Hird was told he would be forced to watch his mother's throat being slit. In the telephone conversation, defendant claimed to have stabbed somebody else in the throat several nights earlier. The trial court ruled that the Hollywood stabbing was admissible in this case to support the credibility of Mr. Hird's testimony concerning the threat during the telephone call to slit his mother's throat. The trial court's ruling was based in part on the "Truth-in-Evidence" provisions of article I, section 28, subdivision (d) of the California Constitution. We conclude the "Truth-in-Evidence" provisions of article I, section 28, subdivision (d) of the California Constitution vested the trial court with discretion to permit brief testimony by two witnesses concerning the Hollywood stabbing incident to corroborate Mr. Hird's recollection of the promise to slit his mother's throat during the threatening telephone call.

## II.  BACKGROUND

Defendant was originally charged in an amended information with: attempted murder (Pen. Code[1], §§ 187, 664, subd. (a), counts 1 and 2); discharging a firearm into an automobile (§ 246, count 3); stalking (§ 646.9, subd. (a), count 4); criminal threat (§ 422, count 5); dissuading a witness by threat or violence (§ 136.1, subd. (c)(1), count 6); and misdemeanor resisting arrest. (§ 148, subd. (a)(1), count 7.) Prior to the commencement of jury selection, defendant pled no contest to the count 7 misdemeanor resisting arrest charge.

The jury acquitted defendant of attempted murder as charged in counts 1 and 2 but was unable to reach a verdict as to the lesser included offense of attempted voluntary manslaughter. A mistrial was declared as to the lesser included offenses of attempted voluntary manslaughter as to counts 1 and 2. Defendant was convicted though of shooting at an occupied automobile as charged in count 3. As to count 3, the jury found that defendant used a firearm within the meaning of section 12022.5, subdivision (a)(1). Defendant was also convicted of stalking as charged in count 4. As to count 5, defendant was convicted as charged of making a criminal threat. As to count 6, defendant was convicted of attempting to dissuade a witness within the meaning of section 136.1, subdivision (a)(2).

We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908–909.) Brooke Duitsman met defendant in October 1998, when he visited her in Indianapolis. Ms. Duitsman was accompanied by her friend, Stan Sakowski. Ms. Duitsman spent time with defendant during his visit. Thereafter, Ms. Duitsman occasionally spoke with defendant on the phone when she telephoned Mr. Sakowski. Ms. Duitsman had a friendship with defendant rather than a romantic relationship. Ms. Duitsman visited defendant in California over the weekend of October 31, 1998, during which time they slept together. However, Ms. Duitsman believed this was a one-time sexual encounter. She returned to Indianapolis. Ms. Duitsman continued to speak to defendant by telephone. In February 1999, Ms. Duitsman moved to defendant's apartment in California. Ms. Duitsman wanted to get away from Indianapolis because she had broken up with her boyfriend. Defendant had offered to "help [her] out." Ms. Duitsman had her own bedroom in defendant's house. Defendant did not kiss her, hold her hand, or otherwise indicate he wanted to start a romantic relationship.

---

[1] Unless otherwise noted, all future statutory references are to the Penal Code.

Ms. Duitsman started working at an art supply store in early March 1999. In early April, Ms. Duitsman arrived home at 2:00 or 3:00 a.m. Defendant was very angry. Defendant called Ms. Duitsman a "slut" and "whore." Defendant continued to yell at Ms. Duitsman for one-half hour to one hour. In the morning, defendant continued to yell at Ms. Duitsman. Defendant threw a lighter at Ms. Duitsman while she was still in bed. Later that morning, defendant continued to call Ms. Duitsman names and threw her purse against the wall.

Ms. Duitsman began dating Mr. Hird shortly thereafter. Defendant was aware that Ms. Duitsman received telephone calls from Mr. Hird. Defendant appeared to be upset about Ms. Duitsman's contact with Mr. Hird. On one occasion, while Ms. Duitsman was speaking with Mr. Hird on the telephone, defendant threw over the kitchen table, yelled at her, and disconnected the call. Defendant backed Ms. Duitsman into a corner and continued to yell at her. Ms. Duitsman called the police and reported that she was feeling threatened by defendant. When the police called back later, defendant told them there was no problem.

Ms. Duitsman began a sexual relationship with Mr. Hird in late May. Ms. Duitsman occasionally spent the night at Mr. Hird's home. Defendant continued to "yell" at Ms. Duitsman about the time she spent with Mr. Hird. Ms. Duitsman explained to defendant she owed "no obligation" to him because they were not in a relationship. On one occasion in May, defendant was upset with Ms. Duitsman about her relationship with Mr. Hird. Defendant knocked Ms. Duitsman down on the couch. Defendant landed on top of Ms. Duitsman with his knee on her chest and face and began choking her. After a while, defendant let Ms. Duitsman get up. Ms. Duitsman had torn his shirt in the struggle. Defendant then ripped off Ms. Duitsman's blouse. Ms. Duitsman called the police and went outside to wait for them. However, the police never arrived. Ms. Duitsman packed some of her belongings to place them in storage. Defendant apologized. Defendant told Ms. Duitsman he did not want her to leave. Thereafter, Ms. Duitsman stayed with friends, including Mr. Hird.

In mid-June, Ms. Duitsman went to Las Vegas with Mr. Hird over a weekend. Ms. Duitsman falsely told defendant that she went to Las Vegas with a friend. Ms. Duitsman falsely identified the friend as a woman named Celeste. Ms. Duitsman went to defendant's house on the following Monday to care for her dog. Ms. Duitsman described what happened then as follows, "He ... said that he knew I hadn't gone to Las Vegas with Celeste; and he said why don't you admit it, and I said okay." Defendant told Ms. Duitsman to get out of the house. When Ms. Duitsman tried to get her dog, defendant first blocked her way, then grabbed her by the back of her head and threw her

out of the screen door. Ms. Duitsman fell onto the porch. Ms. Duitsman was crying and saying: "Please, let me get my dog. My purse is still in the house." Defendant told her, "No." Defendant took her keys and broke her car key in half. Defendant yelled at Ms. Duitsman. Defendant told her he was going to kill her and Mr. Hird as well as her family members. When Ms. Duitsman tried to slap defendant, he grabbed her and threw her down in the driveway.

Ms. Duitsman went to the next-door neighbors' home, where she called the police. When the police arrived shortly thereafter, defendant had left his home. Ms. Duitsman broke a window to get inside defendant's home to retrieve another set of car keys and her purse. However, she was unable to find her purse or backpack with her belongings. Ms. Duitsman found that defendant had placed her dog, cat, and her ferret cage in the backyard. Defendant called Ms. Duitsman at her place of employment that evening. Defendant told Ms. Duitsman he wanted to kill her because she had called the police. Ms. Duitsman reported the call to the police. Ms. Duitsman spoke to defendant by telephone a few days later. Defendant told her he had been arrested. Defendant said that he was sorry and wanted to maintain their friendship. The police returned Ms. Duitsman's purse and backpack to her the day after the incident. Ms. Duitsman's notebook was inside her backpack. The notebook contained the phone number of Mr. Hird's parents as well as directions to their home.

Mr. Hird received a phone message during the following week. The message indicated his head would be "chopped off." On approximately June 20, 1999, Mr. Hird spent the Father's Day weekend at his parents' home in Laguna Niguel. Mr. Hird received five or six phone calls there throughout the night. The caller hung up when Mr. Hird answered. When Mr. Hird returned home on Sunday evening, he noticed that the power was out in portions of his house. Mr. Hird discovered that several electrical wires had been cut and there was other damage to the power system. Mr. Hird's phone lines were also cut. Mr. Hird immediately reported the incident to the police. Approximately five days later, defendant admitted to Ms. Duitsman that he had cut Mr. Hird's phone and electrical lines. Defendant apologized to Mr. Hird, said he was frustrated and angry, and agreed to pay for the damage. Defendant said he was frustrated because Ms. Duitsman had other interests beside him. Defendant later gave Ms. Duitsman $500 for the repair of Mr. Hird's telephone and electrical lines.

Ms. Duitsman attempted to keep her dog in the hotels where she stayed. Ms. Duitsman then telephoned defendant to ask if he would keep her dog until she found a place of her own. Defendant agreed to do so. Ms. Duitsman's father, who was visiting from out of state, accompanied her to

defendant's home when she took the dog. No problem occurred during the meeting. However, toward the end of June, defendant repeatedly paged Ms. Duitsman. Defendant left a voice message indicating that he was going to set the dog loose. Ms. Duitsman returned the telephone call. Ms. Duitsman pleaded with defendant to not release the dog. Later that day, Mr. Hird accompanied Ms. Duitsman to defendant's house. They remained there approximately an hour discussing the dog. Defendant told Ms. Duitsman he did not like having the dog at his home if she did not want to be his friend. Eventually, defendant agreed to keep the dog.

Ms. Duitsman moved into her own house during the early part of July 1999. Mr. Hird helped Ms. Duitsman move into her new residence. On July 7, 1999, Ms. Duitsman spent the evening with Dan Boyle. Mr. Boyle had been introduced to Ms. Duitsman by the woman identified only as Celeste. Mr. Hird went to Ms. Duitsman's house after watching a baseball game. Mr. Boyle drank approximately two beers before Mr. Hird arrived. Mr. Hird drank approximately two beers after he arrived at Ms. Duitsman's home.

Defendant telephoned Ms. Duitsman. Defendant was upset because Ms. Duitsman was "hanging out" with Mr. Boyle. Defendant stated, "Oh, I guess you're screwing him now." Defendant yelled and called Ms. Duitsman, "[S]lut, whore, bitch." Ms. Duitsman hung up the phone. Defendant called again. Mr. Boyle took the phone. Defendant was asked why he kept calling Ms. Duitsman. Defendant called repeatedly over the next few hours. Defendant asked Ms. Duitsman if she was having sex with both Mr. Hird and Mr. Boyle. Ms. Duitsman was upset and cried. Neither Mr. Hird nor Mr. Boyle threatened defendant in any way. Mr. Hird explained to Mr. Boyle that defendant was volatile. But defendant could be placated and by remaining calm, everybody would be safer.

Ms. Duitsman went to bed at approximately 11:00 p.m. or 12:00 a.m. Mr. Hird and Mr. Boyle decided to go to defendant's house to discuss the phone calls. Mr. Hird did not believe it was dangerous to go to defendant's home. This was because on the previous occasion, defendant was friendly. The two men drove to defendant's home in Mr. Hird's truck. As they got out of the truck, Mr. Boyle grabbed a small crowbar. Defendant's front door was slightly ajar when Mr. Hird knocked on it. Defendant came to the door. Mr. Hird explained that defendant should stop calling Ms. Duitsman. Defendant responded that Ms. Duitsman would tell him that if she wanted him to stop calling. Mr. Hird explained that Ms. Duitsman was afraid of defendant. Thereafter, an argument ensued. Defendant saw Mr. Boyle in the driveway. Defendant asked why Mr. Boyle had a tire iron. Mr. Boyle testified he responded, "I think you're a psycho or nut, something like that."

Defendant invited Mr. Hird and Mr. Boyle to come into the residence. Defendant came outside and walked into the driveway. Mr. Hird repeated that defendant should stop calling Ms. Duitsman. Suddenly, defendant lunged at Mr. Boyle. Mr. Boyle was pushed to the ground. Mr. Boyle dropped the crowbar and ran. Defendant ran back inside his house. Mr. Hird and Mr. Boyle ran to the nearby truck. Mr. Hird started the motor and put the truck in gear. While driving away, Mr. Hird saw defendant come down the driveway into the street. Mr. Hird saw defendant point a gun and start firing. Defendant was firing at the truck in which both Mr. Hird and Mr. Boyle were fleeing. Mr. Hird saw a muzzle flash and was immediately covered in glass. The window on the driver's side was shattered. Mr. Hird heard five or six gunshots. Mr. Hird and Mr. Boyle ducked down to the middle of the seat as they drove away.

Soon they were a safe distance from defendant's home. Mr. Hird used his cellular phone to call the police. The operator who answered told Mr. Hird that the police were too busy to respond. Thereafter, Mr. Hird flashed his headlights at a police car that had its emergency lights on. The officer pulled over and told Mr. Hird they were on another call regarding a prowler and could not help him. Mr. Hird drove toward Ms. Duitsman's home. Defendant called Mr. Hird's cellular phone. Defendant said, "You're lucky you're not dead." When Mr. Hird and Mr. Boyle arrived at Ms. Duitsman's home, she called defendant. During the conversation, defendant said that he shot at Mr. Hird and Mr. Boyle. Mr. Hird called the Los Angeles County Sheriff's Department. Two deputies came to Ms. Duitsman's home, examined Mr. Hird's truck, and determined that the incident occurred in the jurisdiction of the Los Angeles Police Department. Thereafter, Mr. Hird and Mr. Boyle drove to the Harbor Division of the Los Angeles Police Department, where officers took a report and photographed the truck. After Mr. Hird left, defendant and Mr. Sakowski came to Ms. Duitsman's home. Defendant yelled to Ms. Duitsman from outside her fence demanding to know where Mr. Hird and Mr. Boyle were. Ms. Duitsman told defendant they had gone to the police department. Defendant and Mr. Sakowski left.

Mr. Hird returned to Ms. Duitsman's house. Within an hour, defendant and Mr. Sakowski threw rocks at Ms. Duitsman's window. Ms. Duitsman and Mr. Hird stepped outside the door. Defendant was there with Mr. Sakowski. Ms. Duitsman yelled at defendant, "Why are you doing this?" Defendant yelled to Mr. Hird, "Why don't you come down here and fight me." A patrolling deputy sheriff or highway patrol officer spoke to defendant. During the conversation, defendant was asked if his car was on the street. Defendant responded that he was just leaving. Thereafter, defendant and Mr. Sakowski left.

Defendant continued to call Mr. Hird several times over the next few days. Defendant suggested that it would be a "bad idea" for Mr. Hird to press charges. Defendant said, "[I]f anybody came to [my] front door looking for [me], that people would come looking for [Mr. Hird]." Mr. Hird described defendant's threat as follows, "He knew where my family lived and that, yes, if anything happened to him … something would happen to the people … I love." Mr. Hird moved to his parents' home a few days later. Defendant called Mr. Hird there several times. On one occasion, defendant telephoned Mr. Hird at approximately 1:00 a.m. Mr. Hird described the telephonic threat as follows, "He told me that if he was to go to trial and go to jail, … he had nothing to lose, that he would kill me, that he would slit my mother's throat and make me watch." Defendant also threatened the lives of Ms. Duitsman and her family in that early morning telephone conversation. Defendant claimed to have stabbed somebody in the throat just a few nights earlier and had no regard for anybody. Mr. Hird testified, "[Defendant] said … if he needed to kill me, he would." Defendant also repeated that Mr. Hird was lucky to be alive. Defendant claimed he was an "expert marksman" and had been in the Gulf War as a Marine in 1991. Defendant repeatedly stated that he had "nothing to lose." Defendant told Mr. Hird to ignore any subpoena and move away. Mr. Hird described another portion of the telephone conversation like this: "[H]e said … he knew where I was parking my car when I was at [Ms. Duitsman's] house. [¶] … I know where you're working in Marina del Rey. I know where your friends are in Hollywood. He made mention of all the places I had been going."

Dr. Kris Mohandie, a psychologist with the Los Angeles Police Department, had extensive experience with stalking cases. Dr. Mohandie had consulted with the department's Threat Management Unit for eight or nine years. It was Dr. Mohandie's experience that the victims: attempt to manage the situation on their own; often attempt to appease the stalker rather than request help and risk escalating the situation; fear the police will not do anything; and do not always recognize the situation as stalking. Dr. Mohandie found that it was not unusual for a victim to speak to the stalker after having been threatened with violence because: "They may feel like it's better to know what he's thinking by talking with him and maybe being able to say the right thing. Versus rejecting the phone call and fearing that he will just show up, or he will show up at the work and make things embarrassing or a whole host of other consequences they may fear."

### III. DISCUSSION

#### A. *Evidence of an Unrelated Offense*

Defendant argues the trial court improperly admitted evidence of an unrelated offense to corroborate Mr. Hird's testimony. Prior to trial, the

prosecutor moved to admit evidence of defendant's involvement in an uncharged stabbing incident in Hollywood. Both defense counsel and the prosecutor made offers of proof as to the uncharged offense. Defense counsel said that defendant was charged in another case with attempted murder and two counts of aggravated assault and "a lot of special allegations." The other case was dismissed according to defense counsel. Nine days elapsed between the commission of the uncharged offense and the charged crimes according to defense counsel.

The prosecutor then made an offer proof concerning the factual nature of the uncharged offense as follows: "[I]t was alleged, and there are witnesses—although the victim in this case has not been found—there were other witnesses present that alleged defendant stabbed an African American. [¶] Although there [are] special allegations in that information, I seek to only introduce the act of stabbing an African American, because in one of the threats, post shooting in this case, which was July 14, there were also allegations of terrorist threats against Kevin Hird, occurring on August 9 of this year. As part of what Kevin Hird, the victim himself, noted down ...."

At this point in the proceedings, the trial court inquired as to the date and nature of the terrorist threats. The deputy district attorney continued with her offer of proof: "One of the threats among others, several phone calls occurring on that day, one among others, the defendant threatened to kill Kevin Hird, and in issuing that threat, he also stated he had stabbed a nigger. He used those words. That's what Kevin said the defendant used."

Defense counsel then added to the offer proof as follows: "So the court will have somewhat of a background on both situations, Your Honor, just quickly, in our situation on July 14, it's a situation where there are communications that are going back and forth between Mr. Stern and Mr. Hird. [¶] It culminates with Mr. Hird and Mr. Boyle going to my client's place of residence at 1:30 in the morning, unannounced, uninvited. Bottom line is that they go there. Melee breaks out between [*sic*] all of them. [¶] Apparently, Mr. Boyle, who goes to back up Mr. Hird, has a tire iron. There is a scuffle of sorts. The testimony is that ... my client goes back into his home; apparently gets a weapon, a gun; comes back out. [¶] By that time Mr. Hird and Mr. Boyle had gone to Mr. Hird's vehicle, and as they are moving in the vehicle, my client fires off a number of rounds at them. One of them resting in the headrest behind Mr. Hird's head."

Defense counsel then set forth the alleged facts as they related to the uncharged defense: "Now, the incident up in Hollywood is that, apparently, two different groups are out enjoying the evening. The alleged victim in that

case is one of two other males. There are three males, three females. Apparently, they are leaving a nightclub. Words are exchanged between Mr. Stern and a friend of his by the name of [Sakowski]. [¶] Apparently, racial slurs are being exchanged, at least on the part of Mr. Stern and Mr. [Sakowski]. A fight breaks out.... [¶] The end result is a gentleman got stabbed in the arm. Was a very serious slice, the upper arm. Apparently, might have gone all the way down to the bone." As a result, defendant was charged with attempted murder and other offenses in the other case which were ultimately dismissed. The deputy district attorney then argued that the evidence was admissible pursuant to Evidence Code section 1101, subdivision (c). The prosecutor indicated she would only be calling only one witness regarding this incident and that any ethnic slurs could be redacted.

The trial court ruled: "If I may, relying on the case of *People v. Millwee* (1998) 18 Cal 4th 96, from our California Supreme Court, which says when prior acts are highly inflammatory, that the court does a careful 352 analysis, if it's going to admit such other act evidence. [¶] The court finds the evidence is admissible under 1101, subdivision (c) as highly relevant, and also under 28d of our Constitution which says that all at relevant evidence is admiss[i]ble. I believe it's 28d.... [¶] ... [¶] I find under both it's relevant to credibility of a witness and would bolster that witness's testimony. Because the People have indicated only one witness would be testifying, it will not under 352 require undue consumption of time. However, because it involves a threat of violence, comparable to the charge, and because it involves an ethnic slur, I do want redaction. I want the ethnic slur redacted because I find that highly inflammatory and potentially very prejudicial ...." The trial court also indicated that a limiting instruction should be given to the jurors.

Prior to jury selection, defendant pled no contest to the misdemeanor interfering with a police officer charge in count 7 of the amended information. The prosecutor's request to allow testimony concerning defendant's conduct while resisting arrest was denied. The trial court stated: "I won't let it in. I think the People have enough evidence at their disposal in this matter, but no, I will not let in mini trials on misdemeanors." After the jury was selected, defense counsel raised the issue of the uncharged offense again. During the discussion, defense counsel indicated that defendant would be testifying. During his anticipated testimony, defendant would not deny making the telephonic threat nor referring to the stabbing "up in the Hollywood area." Thereafter, defense counsel made an opening statement to the jury. During the opening statement, defense counsel explained defendant would testify.

In the midst of the prosecution case, the deputy district attorney called Baelin Barca to testify concerning the uncharged incident. Defense counsel

interposed his prior relevance and Evidence Code section 352 objections again. The trial court overruled the objections and denied defense counsel's mistrial motion. The jury was later instructed: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. [¶] This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of assessing the credibility of witness Kevin Hird. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

By the time Ms. Barca testified and the court had overruled defense counsel's relevance and Evidence Code section 352 objections and denied his mistrial motion, testimony had been received which gave substance to the pretrial offers of proof. When the trial court ruled for the second time on the relevance and Evidence Code section 352 objections and denied the mistrial motion, there was testimony concerning: defendant's threats and repeated references to Ms. Duitsman as a "slut" and a "whore" when their sexual relationship terminated; Mr. Hird's sexual relationship with Ms. Duitsman; defendant's ensuing jealousy which included physical assaults on Ms. Duitsman; defendant's threats to kill both Mr. Hird and Ms. Duitsman; numerous telephone calls to Mr. Hird where the caller would hang up; vandalism to Mr. Hird's electrical and telephone lines; defendant's admission he had committed the acts of vandalism; defendant's payment of $500 to Mr. Hird as compensation for the electrical and telephone wire damage; on July 7, 1999, defendant had fired a handgun at both Mr. Hird and Mr. Boyle as they were fleeing in a truck; and after the shooting, defendant threw rocks at Ms. Duitsman's residence. Further, there was testimony as to the threats to Mr. Hird concerning testifying in this case. Mr. Hird described the threatening call as follows: "He said he would slit my mother's throat and force me to watch it. That I should see that type of thing. He was bragging that he stabbed somebody in the throat just a couple of nights earlier, and that he basically had no regard for anybody; and that if he needed to kill me, he would."

Ms. Barca testified the victim, identified only as "Payback," was stabbed in the arm. Detective Thomas Chevolek interviewed defendant after the stabbing incident involving the victim identified only as "Payback." Defendant claimed to have acted in self-defense.

The trial court did not abuse its discretion in permitting the Hollywood stabbing evidence to be considered on the issue of Mr. Hird's credibility. As noted previously, defense counsel reiterated his prior objections when the

Hollywood stabbing evidence was actually presented. When the objections were reiterated, the trial court knew defendant would testify and would contradict Mr. Hird's testimony in material respects.

At the outset, there is no merit to the suggestion that Evidence Code section 1101, subdivisions (a) and (b) have anything to do with the proper resolution of this case.[2] The evidence of the uncharged offense was received solely on the issue of Mr. Hird's believability—an obviously important issue. Accordingly, the restrictions on character evidence in Evidence Code section 1101 were inapplicable. Evidence Code section 1101, subdivision (c) states, "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." The Law Revision Commission comment to Evidence Code section 1101 states in relevant part: "Nor is Section 1101 concerned with evidence of character offered on the issue of the credibility of a witness; the admissibility of such evidence is determined under Section 786–790. See Evidence Code § 1101(c)." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Pen. Code (1995) foll. § 1101, p. 438.) The late Presiding Justice Bernard S. Jefferson explained the effect of Evidence Code section 1101, subdivision (c) as follows: "The Law Revision Commission's comment to Evidence Code section 1101 points out that this section is not intended to refer to character-trait evidence offered to prove a fact relating to credibility of a witness:. 'Nor is Section 1101 concerned with evidence of character offered on the issue of the credibility of a witness; the admissibility of such evidence is determined under Sections 786-790.' The quoted Law Revision Commission's comment to Evidence Code section 1101 points out unmistakably that the admissibility of character-trait evidence on the issue of credibility of a witness is governed by Evidence Code sections 786 to 790 and not by section 1101." (*People v. Thompson* (1979) 98 Cal.App.3d 467, 475 [159 Cal.Rptr. 615].) Only Evidence Code sections 786[3] and 787[4] are arguably pertinent to the evidentiary dispute in sections this case. Evidence Code

---

[2] Evidence Code section 1101, subdivisions (a) and (b) state: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[3] Evidence Code section 786 states, "Evidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness."

[4] Evidence Code section 787 provides, "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

sections 788[5] which involve prior felony convictions and 789[6] which prohibits the use of religious belief to support or attack witness credibility are entirely unrelated to this case.

However, Evidence Code sections 786 and 787 are likewise inapplicable because they have been abrogated by the June 8, 1982, adoption of article I, section 28, subdivision (d) of the California Constitution which the California Supreme Court has described as follows: "Section 28(d), adopted on June 8, 1982, and applicable in cases in which the charged offense was committed on or after that date (*People v. Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149] []), provides in relevant part: 'Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding .... Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103.... ' " (*People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619].)     ▇ In *Harris*, the Supreme Court held that Evidence Code section 786 and 787 were irrelevant in a criminal case because of the adoption of "Truth-in-Evidence" provisions of article I, section 28, subdivision (d) of the California Constitution: "Although the nature of the evidence that is the subject of Evidence Code sections 786–790 is similar to that in Evidence Code sections 1101–1103, the purpose for which it is to be admitted is not to prove conduct. We, therefore, agree with the conclusion of the Court of Appeal in *People v. Taylor* [(1986)] 180 Cal.App.3d 622, 631 [225 Cal.Rptr. 733], that section 28(d) effected a pro tanto repeal of Evidence Code section 790, and find no basis on which to distinguish Evidence Code sections 786 and 787." (*Harris, supra,* at p. 1081.) The effect of the adoption of article I, section 28, subdivision (d) of the California Constitution was described by the Supreme Court in *People v. Wheeler* (1992) 4 Cal.4th 284, 291 [14 Cal.Rptr.2d 418, 841 P.2d 938] as follows: "We and the Courts of Appeal have consistently held that in criminal

---

[5] Evidence Code section 788 states: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless: [¶] (a) A pardon based on his innocence has been granted to the witness by the jurisdiction in which he was convicted. [¶] (b) A certificate of rehabilitation and pardon has been granted to the witness under the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code. [¶] (c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense. [¶] (d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

[6] Evidence Code section 789 provides, "Evidence of his religious belief or lack thereof is inadmissible to attack or support the credibility of a witness."

proceedings, section 28(d) supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28(d) itself. (*People v. Mickle* (1991) 54 Cal.3d 140, 168 [284 Cal.Rptr. 511, 814 P.2d 290] []; *People v. Harris, supra,* 47 Cal.3d 1047, 1080–1082, 1090–1091; *People v. Taylor[, supra,]* 180 Cal.App.3d 622 [225 Cal.Rptr. 733]; see *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].) The appellate decisions reject arguments that section 28(d) was intended only to prevent courts from excluding evidence because its seizure violated the California Constitution (cf., *In re Lance W., supra,* at p. 890). Were that the sole purpose, the cases reason, there was no need to preserve some, but not all, existing *statutory* limitations on the admission of relevant evidence. Nor was it necessary to restrict the *Legislature's* power to enact new exclusionary rules. Indeed, both the plain language of section 28(d) and the ballot materials for Proposition 8 indicate an intent to make all relevant evidence admissible, subject only to specified exceptions. (*Harris, supra,* 47 Cal.3d at p. 1082, & fn. 16; see also *In re Lance W., supra,* 37 Cal.3d at p. 888.) [¶] *Harris* and *Mickle,* both *supra,* employed this reasoning to conclude that statutory prohibitions on impeachment with conduct evidence other than felony convictions (see Evid. Code, §§ 787, 788) no longer apply in criminal cases. In *Harris,* we held that section 28(d) renders evidence of prior reliability as a police informant admissible to attack or support a witness's credibility. (47 Cal.3d at pp. 1080–1082 [].) In *Mickle,* we noted that a jailhouse informant's threats against witnesses in his own case implied dishonesty and moral laxity. Hence, we ruled, the threats were relevant and admissible to impeach him under section 28(d). (54 Cal.3d at p. 168.)" (See *People v. Alvarez* (2002) 27 Cal.4th 1161, 1173 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Hence, because the sole issue is one of witness credibility, Evidence Code sections 786 and 787, just as Evidence Code section 1101 are inapposite.

Subject to Evidence Code section 352, the controlling issue therefore is, pursuant to article I, section 28, subdivision (d) of the California Constitution, the relevance of defendant's Hollywood stabbing incident mentioned in the telephonic threat to the believability of Mr. Hird. ▮ We review an issue concerning the admissibility of uncharged misconduct under California Constitution article I, section 28, subdivision (f) utilizing the deferential abuse of discretion standard of review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091–1092 [125 Cal.Rptr.2d 896].) ▮ Defendant was charged with two attempted murders of Mr. Hird and Mr. Boyle which occurred on July 14, 1999. The August 9, 1999, telephone call was made in part in an effort to forestall Mr. Hird from testifying against defendant—the charged offense in count 6 of the amended information. The amended information also charged defendant in count 5 with criminal threats. Two of

the charged offenses, criminal threats and attempting to dissuade a witness, involved among other things, the use of words. The accuracy of Mr. Hird's in-court recitation of those words was an important issue. The threat involved the use of a knife on Mr. Hird and his parents. In the midst of the threatening telephone call defendant claimed to have stabbed somebody "just a couple of nights earlier." The evidence at issue demonstrated defendant was in fact involved in a stabbing around the time of the threatening telephone call thereby lending credence to Mr. Hird's testimony concerning the threats. The trial court did not abuse its discretion in reaching this conclusion.

The fact that defendant falsely claimed to have stabbed the victim in the neck during the stabbing did not *require* the court to exclude the evidence concerning the Hollywood incident. As noted previously, the victim, known only as "Payback," was stabbed in the arm. The trial court had the discretion to exclude the Hollywood stabbing evidence pursuant to Evidence Code section 352 and chose not to do so. The trial court exercised its discretion to exclude testimony concerning defendant's resistance when he was arrested. The trial court had the discretion to permit the prosecution to introduce testimony concerning the Hollywood stabbing incident even though defendant falsely claimed the victim was stabbed in the throat during the telephone threat directed at Mr. Hird.

■ In any event, even if the trial court should not have introduced the prior misconduct evidence, any error was harmless. The sole error is an alleged violation of state evidence law. No federal constitutional issue was raised in the trial court nor has one been posited with us. Reversal is available only if there is a reasonable probability of a different result on retrial. (*People v. Carter* (2003) 30 Cal.4th 1166, 1197 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) While testifying, defendant admitted to the gist of the prior stabbing allegation. Further, defendant's admission to the police indicated he acted in self-defense. Also, the jury knew the Hollywood stabbing charges had been dismissed. Finally, the jury was instructed that the sole reason for which the Hollywood stabbing incident could be considered was Mr. Hird's credibility. It is presumed the jurors followed those instructions. (*Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 [85 L.Ed.2d 344, 105 S.Ct. 1965]; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

Three final comments are warranted. First, there is no merit to defendant's Evidence Code section 352 argument. The trial court did not abuse its discretion in concluding that the fact defendant did stab someone was not unduly prejudicial given the importance of Mr. Hird's testimony. The present case is therefore different from *People v. Brown* (1993) 17 Cal.App.4th 1389, 1394–1398 [22 Cal.Rptr.2d 14], a case relied upon by defendant, where the

Court of Appeal reversed a child molestation conviction where two uncharged victims testified as to the accused's sexual misconduct and improper limiting instructions were given. Unlike *Brown*, the limited testimony concerning the Hollywood stabbing incident was directly pertinent to the accuracy of Mr. Hird's recollection of the threatening language in the telephone call which served as the sole basis of two charged offenses—criminal threats and attempting to dissuade a witness. In any event, as noted in the immediately preceding paragraph any error was harmless—defendant took the stand and admitted it happened.

Second, evidence of crimes of moral turpitude, such as stabbing somebody, are generally used to *impeach* a witness's testimony. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [124 Cal.Rptr.2d 373, 52 P.3d 572] [assault with a deadly weapon]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 361 [68 Cal.Rptr.2d 61] [murder and solicitation to commit murder]; *People v. Lepolo* (1997) 55 Cal.App.4th 85, 88–90 [63 Cal.Rptr.2d 735] [brandishing a machete at a police officer].) ■ That is how the California Constitution article I, section 28, subdivision (d) issue generally arises—the use of an uncharged incident to impeach a witness's testimony, not to lend credence a victim's under oath statement. But there is nothing in article I, section 28, subdivision (d) to prevent the use of relevant testimony to prove a crime victim, or any other witness for that matter, is telling the truth.

Third, insofar as the trial court ruled that Evidence Code section 1101, subdivision (c) allowed for the admission of the stabbing evidence, it acted beyond the scope of its allowable judicial discretion. Evidence Code section 1101, subdivision (c) does not create a grounds for the admissibility of character evidence. It merely provides that Evidence Code section 1101, subdivisions (a) and (b) are inapplicable to the use of uncharged misconduct which is received on the issue of whether a witness should be believed. ■ However, the error in this regard is not a ground for reversal because the trial court did not abuse its California Constitution article I, section 28, subdivision (d) powers. Given our resolution of these issues we need not address the parties' other contentions.

B.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.  DISPOSITION

The judgment is affirmed.

Armstrong, J., concurred.

---

*See footnote, *ante*, page 283.

**MOSK, J.,** Concurring.—I write separately to emphasize that this case does not involve Evidence Code section 1101 (section 1101) because the defendant's prior conduct was offered for a purpose that did not require the fact finder to infer that the defendant had a particular disposition, propensity, or character trait.

Section 1101 is implicated when evidence of a person's character is "offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) Here, the evidence that Scott Stern (Stern) was involved in a stabbing incident was not offered for the purpose of proving conduct other than the stabbing. It was offered and admitted for the limited purpose of supporting the credibility of the victim's testimony about Stern's threat. The testimony concerning the stabbing was pertinent to and corroborative of the victim's recollection of Stern's language in the phone call—language that was the foundation of the charges of making criminal threats and attempting to dissuade a witness. Because this use of evidence concerning prior misconduct does not require the inference that if Stern was involved in a stabbing in the past he is likely to have acted in a specific manner on the occasion in question, section 1101 does not apply here.

It is not the case that evidence of the defendant's prior bad acts is categorically admissible regardless of section 1101 when it is offered to bolster the witness's credibility. Had the fact finder been required to draw inferences about Stern's character or propensity in order for the evidence of Stern's prior misconduct to have supported the victim's credibility, section 1101 would have barred the admission of evidence of the prior acts. The credibility of the testifying witness is not a "fact (such as motive, opportunity, preparation, plan, knowledge, identity, absence of mistake or accident …" other than disposition sufficient to permit its admission under section 1101, subdivision (b). (See *People v. Thompson* (1979) 98 Cal.App.3d 467, 480–482 [159 Cal.Rptr. 615] [§ 1101 prohibits the admission of evidence of defendant's prior misconduct to bolster a witness's credibility by resort to evidence of the defendant's disposition, character, or propensity].) Because no inference about Stern's character or disposition was required in order for the evidence of the stabbing to accomplish the purpose for which it was admitted, section 1101 did not bar its admission here.

Appellant's petition for review by the Supreme Court was denied October 29, 2003. Kennard, J., was of the opinion that the petition should be granted.