[No. C041997. Third Dist. July 9, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
CHESTER ALLEN COKER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I of the DISCUSSION.

## COUNSEL

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Julie A. Hokans and Angelo S. Edralin, Deputy Attorneys General for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—Chester Allen Coker (defendant) appeals after a jury convicted him, inter alia, of two counts of robbery and found true firearm use enhancements. Sentenced to prison for a lengthy term, defendant argues the court erred in admitting an incriminating letter he wrote and by imposing an unauthorized sentence. Since these contentions lack merit, we shall affirm the

judgment. In the published portion of the opinion, we discuss why the trial court lawfully sentenced defendant.

## FACTUAL AND PROCEDURAL BACKGROUND

The crimes arose from a plan devised by defendant and Ruben Puga to rob a drug dealer with the hope he would not report the crime to law enforcement. Puga induced the drug dealer—Eric Rodriguez—to go to a residence on Eldridge Avenue in Sacramento with the promise of a set of Dayton tire rims at a low price. Rodriguez was enticed. He and his girlfriend, Alicia McPeters, arrived at the residence around 11:00 p.m. on August 27, 2000. Puga met them at the door and invited Rodriguez to a back room. While en route, defendant—who was wearing latex gloves—appeared out of nowhere and struck Rodriguez on the face with a handgun. Defendant and Puga took $1,300 in cash from Rodriguez and McPeters. When Rodriguez resisted, defendant struck him again in the face with the handgun, and Puga swung at him with a bat. Rodriguez managed to break free and attempted to escape, but defendant fired two shots near his head and Puga hit him again with the bat.

Eventually Rodriguez and McPeters were permitted to leave the residence and get in their car. As he was pulling out, Rodriguez informed defendant and Puga that they would not get away with it. Defendant responded by firing two shots at the car, one of which struck Rodriguez in the hip. Rodriguez managed to drive away, but summoned help at a nearby residence.

Law enforcement officers searched the Eldridge Avenue residence and recovered a .45-caliber shell casing, two baseball bats, and a ripped pair of bloody latex gloves that bore one of defendant's fingerprints. On the floor of the residence, they found blood that was consistent with that of Rodriguez.

Rodriguez testified that, after the crime was committed, he received an anonymous letter he believed was from defendant containing what appeared to be an apology for the crimes and a threat that Rodriguez would face retaliation if he cooperated with the prosecution.

The defense was premised on alibi. Defendant, two of his sisters, and defendant's former girlfriend testified defendant spent the night of August 27, 2000, giving tattoos at the Westwood Motel in West Sacramento. One of defendant's sisters, Sheri Castro, testified she rented the room that night.

A third sister of defendant's testified that she had questioned McPeters about the events of August 27, 2000, and that McPeters had admitted she was high on ecstasy that night.

Defendant testified he wore latex gloves "all of the time," and that he might have touched the gloves found at the Eldridge Avenue residence, but he never wore them.

Puga testified he robbed Rodriguez and fired shots at him, but he denied that defendant was his accomplice. Puga testified his accomplice was named "Nick," who wore a bandana around his face during the robbery.

In rebuttal, the People called the owner of the Westwood Motel who testified that Sheri Castro had checked into the motel on the night of August 26, 2000—the day *before* the crimes—but that she had checked out the next day, and the room she had stayed in was vacant on the night of August 27, 2000.

The People also called an investigator with the district attorney's office who had interviewed Puga at Pelican Bay State Prison prior to trial. Puga told the investigator that defendant was his accomplice during the robbery and that defendant had pistol-whipped Rodriguez and shot him when he was getting into his car.

Defendant was charged by information with two counts of robbery (Pen. Code, § 211[1]—counts one and two), willful discharge of a firearm at an occupied motor vehicle (§ 246—count three), assault with a firearm (§ 245, subd. (a)(2)—count four), and being a convicted felon in possession of a firearm (§ 12021, subd. (a)—count five). The information alleged defendant had suffered two prior serious felony convictions (§ 667, subd. (a) (§ 667(a))) and, as such, came within the provisions of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12.) The information included allegations of discharge of a firearm (§ 12022.53, subd. (c) (section 12022.53(c)) as to count two, discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d) (section 12022.53(d))) as to counts one and three, and firearm use (§ 12022.5, subds. (a) & (d)) and infliction of great bodily injury upon the victim (§ 12022.7, subd. (a)) as to count four.

The jury found defendant guilty on all counts and found true each of the associated allegations. In a bifurcated proceeding, the court found true the prior conviction allegations.

The court sentenced defendant to a 100-years-to-life indeterminate term in prison consecutive to a 30-year determinate term.

---

[1] Undesignated statutory references are to the Penal Code.

## DISCUSSION

### I.*

*Defendant's Letter to Rodriguez*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.

*Sentencing*

Defendant argues his sentence on counts one and two was improperly calculated with respect to the enhancements imposed pursuant to section 12022.53(c) and section 12022.53(d). He proposes that section 12022.53, subdivision (j) (section 12022.53(j)) limits imposition of the enhancements where, as here, defendant's sentence pursuant to the Three Strikes law results in a longer term of imprisonment than that provided for under section 12022.53.[3] This contention fails to withstand scrutiny.

 The court calculated defendant's minimum term of his indeterminate life sentences pursuant to so-called "Option (iii)" of the Three Strikes law (§§ 667, subd. (e)(2)(A)(iii), 1170.12, subd. (c)(2)(A)(iii); *People v. Dotson* (1997) 16 Cal.4th 547, 553 [66 Cal.Rptr.2d 423, 941 P.2d 56] *(Dotson)*). Where a court uses Option (iii), it selects the term for the underlying conviction in accordance with section 1170, and then adds applicable enhancements (whether count specific or status-based) to calculate the minimum indeterminate life term. (§§ 667, subd. (e)(2)(A)(iii), 1170.12, subd. (c)(2)(A)(iii); *Dotson, supra,* 16 Cal.4th at p. 553; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1378–1381 [108 Cal.Rptr.2d 243] *(Byrd)*.)

To this indeterminate life term, the court adds count-specific enhancements (e.g., gun-use enhancements) and status enhancements (such as prior serious felony convictions under section 667, subdivision (a) (667(a))) as a determinate term to achieve the final sentence. (*Dotson, supra,* 16 Cal.4th 547, 557–558.)

 Where, as here, there are multiple third strike convictions, the court repeats the calculation of the minimum indeterminate life term as to each

---

*See footnote, *ante,* page 581.

[3] Section 12022.53(j) provides in part: "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or a longer term of imprisonment."

conviction. (*People v. Byrd, supra,* 89 Cal.App.4th 1373, 1380–1381.) After the addition of count-specific enhancements, each count must then be made to run fully consecutively. (§§ 667, subd. (e)(2)(B), 1170.12, subd. (a)(6); *Byrd, supra,* 89 Cal.App.4th at pp. 1379–1380.) Status enhancements are added at the conclusion of this process (rather than to each count) to reach the final term. (*Byrd, supra,* at p. 1380.)

The court's calculations in the present case were in accord with this sentencing template. On count one, the court began with a five-year term for the robbery of Rodriguez, to which the court added 25 years to life based on the intentional discharge of a firearm causing great bodily injury (§ 12022.53(d)), as well as 10 years for defendant's two prior serious felony convictions (§ 667(a)), for an aggregate minimum term of 40 years to life. To this indeterminate life term, the court added a 25-years-to-life indeterminate term based on the section 12022.53(d) enhancement, for an aggregate term of 65 years to life.

On count two, the court began with a five-year term for the robbery of McPeters, to which the court added 20 years based on the section 12022.53(c) enhancement, as well as 10 years for defendant's two prior serious felony convictions for an aggregate minimum term of 35 years to life. To this indeterminate life term, the court added a 20-year determinate term based on the section 12022.53(c) enhancement.

Counts one and two were ordered to run consecutively for an aggregate indeterminate term of 100 years to life and a determinate term of 20 years. To this sentence, the court added a 10-year determinate term based on defendant's two prior serious felony convictions under section 667(a), which increased the total determinate term to 30 years (and increased the aggregate sentence to 130 years to life).

Defendant contends the court should not have added the count-specific sections 12022.53(c) and (d) enhancements to counts one and two because the court already had used these enhancements once in calculating his minimum indeterminate life term under Option (iii). He proposes that this is mandated by reason of section 12022.53(j), which requires the court to impose punishment pursuant to sections 12022.53(c) and (d) rather than under any other provision of law, "unless another provision of law provides for a greater penalty or a longer term of imprisonment." In defendant's view, Option (iii) of the Three Strikes law provides for a greater penalty than under sections 12022.53(c) and (d), thereby precluding the sentencing court from

separately adding these count-specific enhancements onto to the final Option (iii) calculation in determining his sentence under the Three Strikes law.[4]

A similar claim was rejected in *Dotson, supra,* 16 Cal.4th 547, at page 555, where the court concluded a section 667, subdivision (a)(2) (section 667(a)(2)), five-year enhancement for a prior serious felony should both be used in the Option (iii) calculation and thereafter be added as a separate determinate enhancement to a defendant's indeterminate life term. The court rejected the argument that section 667(a)(2) did not apply due to its provision that it "shall not be applied when the punishment imposed under other provisions of law would result in a longer term of imprisonment." (*Ibid.*) The court noted that it had construed a predecessor of this provision "to mean, 'when multiple statutory *enhancement* provisions are available for the same prior offense, one of which is a section 667[a] enhancement, the greatest enhancement, but only that one, will apply.' [Citation.]" (*Dotson, supra,* at p. 555.)[5] Based on this construction, the court concluded that the provision had no application because "neither [section 1170.12,] subdivision (c)(2)(A), nor an indeterminate life term imposed thereunder, is a sentence enhancement. [Citations.] Rather, subdivision (c)(2)(A) prescribes a method by which defendant's minimum indeterminate life term is calculated. [Citations.]" (*Dotson, supra,* at p. 556.)

Although the language of the provision set forth in section 12022.53(j) is not identical to the language of the provisions of section 667(a)(2) and former section 667, subdivision (b), it is substantially similar, and should be similarly construed. " 'To understand the intended meaning of a statutory phrase, we may consider use of the same or similar language in other statutes, because similar words or phrases in statutes in pari materia [that is, dealing with the same subject matter] ordinarily will be given the same interpretation.' [Citations.]" (*In re Do Kyung K.* (2001) 88 Cal.App.4th 583, 589 [106 Cal.Rptr.2d 31].) This rule has even greater force where, as here, section 12022.53(j) was enacted *after* the Supreme Court's construction of similar language in *Jones, supra,* 5 Cal.4th 1142, and *Dotson, supra,* 16

---

[4] Much of the argument by the parties on this issue concerns this court's decision in *People v. Vo* (2003) 111 Cal.App.4th 321 [3 Cal.Rptr.3d 493], in which review was subsequently granted. As will be shown, the Supreme Court has supplied the answer to defendant's argument in its construction of substantially similar statutes, so the discussion of *Vo* is of no moment.

[5] The previous version of section 667(a)(2) referred to in *Dotson*—former section 667, subdivision (b)—had been so construed in *People v. Jones* (1993) 5 Cal.4th 1142, 1150 [22 Cal.Rptr.2d 753, 857 P.2d 1163] (*Jones*). Former section 667, subdivision (b), like section 667(a)(2), contained a provision similar to the one set forth in section 12022.53(j). Former section 667, subdivision (b), provided: "This section shall not be applied when the punishment imposed under other provisions of law would result in a longer term of imprisonment." (Former § 667, subd. (b), Stats. 1989, ch. 1043, § 1, p. 3619; *Jones, supra,* 5 Cal.4th 1142, 1149.)

Cal.4th 547. "When legislation has been judicially construed and a subsequent statute on a similar subject uses identical or substantially similar language, the usual presumption is that the Legislature intended the same construction, unless a contrary intent clearly appears. [Citation.]" (*People v. Lopez* (2003) 31 Cal.4th 1051, 1060 [6 Cal.Rptr.3d 432, 79 P.3d 548].)

Defendant, though, infers a contrary intent from the legislative history of section 12022.53, which, as introduced in Assembly Bill No. 4 on December 2, 1996, did not include the provision now set forth in section 12022.53(j). (Assem. Bill No. 4 (1997–1998 Reg. Sess.) as introduced Dec. 2, 1996.) The bill was amended on February 19, 1997, to include the language that later became section 12022.53(j). In defendant's view, "[i]f the Legislature had intended to add section 12022.53 enhancements to sentences for underlying crimes that were already longer than the enhancement, the Legislature could have accomplished that aim by enacting Assembly Bill 4 in its original form." Our review of the legislative history referred to does not persuade us as to the merits of defendant's argument.

Assembly Bill 4 was amended to include the language which later became section 12022.53(j) before the bill had undergone any legislative analysis (aside from the routine preparation of the digest by the Office of Legislative Counsel). (Assem. Bill No. 4 (1997–1998 Reg. Sess.) § 2, as amended Feb. 19, 1997.) Prior to the first committee hearing on Assembly Bill 4, in the Assembly Committee on Public Safety, staff counsel prepared a bill analysis, which did not mention the February 19, 1997, amendment to the bill. (Assem. Com. on Pub. Safety, Rep. on Assem. Bill No. 4 (1997–1998 Reg. Sess.) Apr. 8, 1997.) On this bare record, we decline to infer that the Legislature intended that the provision of section 12022.53(j) should be interpreted any differently than the substantially similar provisions at issue in *Jones, supra,* 5 Cal.4th 1142, and *Dotson, supra,* 16 Cal.4th 547.[6]

The Supreme Court also has observed: "The legislative intent behind section 12022.53 is clear: 'The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter

---

[6] We note that the committee report, which was silent on the reason for the amendment, did include a statement from the bill's author, Assemblymember Tom J. Bordonaro, Jr., which voiced his intention to lengthen prison sentences for crimes involving gun use. The report states: "According to the author, 'For far too long, criminals have been using guns to prey on their victims. AB 4 will keep these parasites where they belong . . . in jail! The problem is not guns, the problem is gun violence . . . criminals misusing guns to terrorize, injure and kill their victims . . . . With the Three Strikes law, the voters sent a clear message to criminals. With the 10-20-life provisions of AB 4, we are sending another clear message: If you use a gun to commit a crime, you're going to jail, and you're staying there.' " (Assem. Com. on Pub. Safety, Rep. on Assem. Bill No. 4 (1997–1998 Reg. Sess.) Apr. 8, 1997, p. 2.)

violent crime.' (Stats. 1997, ch. 503, § 1.)" (*People v. Garcia* (2002) 28 Cal.4th 1166, 1172 [124 Cal.Rptr.2d 464, 52 P.3d 648].) Our interpretation of section 12022.53(j) is in accord with this expressed legislative purpose.

■ We conclude that the "other provision of law" language in section 12022.53(j), must be construed, in light of *Jones, supra,* 5 Cal.4th 1142, and *Dotson, supra,* 16 Cal.4th 547, to refer to other *sentencing enhancement statutes*, of which neither section 667, subdivision (e)(2)(A), nor section 1170.12, subdivision (c)(2)(A), is one. (*People v. Murphy* (2001) 25 Cal.4th 136, 155 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) It follows that defendant was properly sentenced.

## DISPOSITION

The judgment is affirmed.

Raye, J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 13, 2004.