*87
 
 Opinion
 

 RAMIREZ, P. J.
 

 A jury convicted John Tauta Lepolo of second degree murder (Pen. Code, § 187), during which he used a rock (Pen. Code, § 12022, subd. (b)). He was sentenced to prison for 15 years to life, plus 1 year, and appeals, claiming the trial court erroneously excluded and admitted evidence, the jury was misinstructed, and the prosecutor committed misconduct. We reject his contentions and affirm.
 

 Facts
 

 Late on the night of July 29, 1994, Lepolo and a relative by marriage,
 
 [1]
 
 hereinafter referred to as “the pedestrian,” were jaywalking across Chicago Avenue,
 
 [2]
 
 in Riverside, attempting to beat oncoming traffic, when the latter was struck by a Volkswagen bus being driven by the victim. After Lepolo checked on the pedestrian and discovered that he was unresponsive, Lepolo approached the bus, said he was going to kill the victim, pulled him out of the bus and began beating and kicking him, despite the victim’s assertions that the collision had been an accident and he was sorry.
 

 A bouncer from a nearby nightclub and his friend approached and tried to calm Lepolo, then pushed him away from the victim, without success. Finally, the bouncer gave Lepolo a bear hug to prevent him from further beating the victim, but Lepolo put his hand inside his jacket simulating a firearm, told the men he had a gun and instructed them to “back off’ or he would shoot them. When they did, he ran off into a nearby field and disappeared. After the victim assured the men that he was all right, they went to assist the pedestrian. While they were distracted with him, Lepolo returned to the bus and began beating and kicking the victim again. When the men came towards the bus to assist the victim, Lepolo took off across the field. The men returned to the pedestrian’s side and, this time, Lepolo returned to the bus carrying a 27-pound cement rock, which he proceeded to throw twice, while aiming, onto the victim’s face and head, killing him. Lepolo was preparing to throw the rock onto the victim’s face and head for a third time when the men set out towards him and he ran off for the last time. Lepolo later admitted to officers and at trial that he wanted to hurt the victim, although he denied wanting to kill him.
 

 Lepolo made it to the home of relatives nearby, and although they checked on the welfare of the pedestrian, Lepolo did not nor did he even inquire of them as to the status of his in-law’s condition. Lepolo went into hiding and stayed there, even after discovering that the victim had died.
 

 
 *88
 
 Lepolo claimed that he was angry and in a rage at the time he killed the victim because he believed that the victim had killed the pedestrian and that the victim was drunk because Lepolo smelled alcohol on his breath and he appeared to be unsteady on his feet. Therefore, Lepolo argued to the jury, he was guilty only of heat of passion voluntary manslaughter. Lepolo also introduced evidence that he had consumed quite a bit of alcohol shortly before the incident, and an expert testified for the defense that this would impair Lepolo’s thinking and judgment. On the basis of this evidence, Lepolo argued, alternatively, that he was guilty of involuntary manslaughter.
 

 Issues and Discussion
 

 1.
 
 Exclusion of Evidence
 

 *
 

 2.
 
 Admission of Evidence
 

 a.
 
 Impeachment Evidence
 

 Lepolo now contends that admission of this evidence requires that we reverse his conviction. We disagree.
 

 During cross-examination of Lepolo, the prosecutor asked him, “Do you remember on . February 5th, [
 
 4
 
 ] holding a 36-inch machete above your head and waving it towards an Orange Police Department officer who was in uniform and threatening him with it?” Lepolo replied, “Yes.”
 

 On February 5, 1994, a police officer from the City of Orange was on patrol when he saw a number of men, who appeared to be drinking, in an alleyway. Lepolo, who was part of the group, ran into a nearby apartment. A few minutes later, Lepolo came up to a fence that separated him from that officer and two others. He yelled some things which the officer could not understand. Lepolo raised a 36-inch machete up over his head, pointed it at one of the other officers, who was in uniform, and said, “I want that officer.” The three officers drew their weapons, pointed them at Lepolo and demanded that he throw down the machete. Instead, Lepolo ran back into the apartment. After Lepolo was arrested for brandishing a weapon, he told the police who questioned him, “That officer pissed me off. I wanted to whack his head off.” He said he grabbed the machete because he “was going to
 
 *89
 
 whack [the officer’s] head off.” Lepolo added, “Maybe next time I’ll use a nine,” which the interrogating officer took to mean a 9-millimeter handgun. When asked whether he still felt anger towards that police officer, Lepolo replied, “I hope I see him again, just him and me, I don’t care about his gun. I’ll have a nine or just whack his head off. I’ll get him.” When the interrogating officer asked Lepolo why he was upset, Lepolo told him that the officer he wanted to harm had flipped him off. The officer tried to explain to Lepolo what had transpired between him and the threatened officer and Lepolo said, “No, I’ll get him.”
 

 The trial court concluded that the above facts constituted the crime of brandishing a weapon, which, when combined with Lepolo’s postarrest statements, constituted conduct indicating moral turpitude.
 

 In contesting the admission of this evidence, Lepolo contends that the trial court should have been confined to the least adjudicated elements of the crime of brandishing a weapon, and, therefore, its reliance upon his statements was error. He is incorrect. When the fact that a defendant has suffered a prior
 
 conviction
 
 is used to impeach, anything beyond the least adjudicated elements may not be examined because problems of proof (and the confusion resulting therefrom) and unfair surprise do not exist.
 
 (People
 
 v.
 
 Wheeler
 
 (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938]; see also
 
 People
 
 v.
 
 Castro
 
 (1985) 38 Cal.3d 301, 316 [211 Cal.Rptr. 719, 696 P.2d 111].) They may well exist, however, when conduct which did not result in a conviction is used to impeach.
 
 (People
 
 v.
 
 Wheeler, supra,
 
 4 Cal.4th at p. 296.) From a logical standpoint, it makes no sense to require the trial court to “name that crime,” to the exclusion of others, when presented with facts of past misconduct. This not only impinges on the prosecution’s theoretical discretion to charge offenses, but it is meaningless, since there never will be a conviction for any particular offense arising from the conduct, Therefore, there was no need in this case for the trial court to designate what occurred between Lepolo and the police officer as brandishing a weapon, to the exclusion of any other offense. Of course, it constituted a brandishing. It also constituted a terrorist threat, under Penal Code section 422,
 
 [5]
 
 a matter which neither side argued to the trial court, and, therefore, which it had no ability to consider. Whether the trial court admits
 
 *90
 
 evidence of past misconduct should be determined solely on the basis that that conduct evinces moral turpitude. The label is not important—the conduct is.
 

 In
 
 People
 
 v.
 
 Thornton
 
 (1992) 3 Cal.App.4th 419 [4 Cal.Rptr.2d 519], this court determined that a violation of Penal Code section 422 evinces moral turpitude. Moral turpitude has been variously described as follows: conduct indicating bad character, a readiness to do evil or moral depravity of any kind
 
 (People
 
 v.
 
 Castro, supra,
 
 38 Cal.3d at p. 314;
 
 People
 
 v.
 
 Lang
 
 (1989) 49 Cal.3d 991 [264 Cal.Rptr. 386, 782 P.2d 627]); acts “attended by knowledge of [the] circumstances and a conscious decision to exploit them sufficient to signify a readiness to do evil . . .”
 
 (People
 
 v.
 
 Rodriguez
 
 (1992) 5 Cal.App.4th 1398, 1402 [7 Cal.Rptr.2d 495]); “ ‘an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man . . .
 
 (People
 
 v.
 
 Mansfield
 
 (1988) 200 Cal.App.3d 82, 87 [245 Cal.Rptr. 800]); or conduct involving violence, menace or threats
 
 (People
 
 v.
 
 Sanders
 
 (1992) 10 Cal.App.4th 1268, 1274 [13 Cal.Rptr.2d 205];
 
 People
 
 v.
 
 Cornelio
 
 (1989) 207 Cal.App.3d 1580 [255 Cal.Rptr. 775]).
 

 In
 
 People
 
 v.
 
 Zataray
 
 (1985) 173 Cal.App.3d 390 [219 Cal.Rptr. 33], the appellate court concluded that simple kidnapping was a crime involving moral turpitude. It held, “The gravamen of the offense is some sort of compulsion causing the victim to feel reasonable apprehension or fear. [Citation.] . . . [I]t. . . involves ‘bad character’ and ‘readiness to do evil’ . . . .”
 
 (Id.
 
 at pp. 399-400.)
 

 In
 
 People
 
 v.
 
 Miles
 
 (1985) 172 Cal.App.3d 474, 481-482 [218 Cal.Rptr. 378], the Court of Appeal held that arson, the “ ‘willful. . . and malicious’ ” burning of property “necessarily involve[d] an intent ‘to do evil.’ ”
 

 In
 
 People
 
 v.
 
 Campbell
 
 (1994) 23 Cal.App.4th 1488, 1493 [28 Cal.Rptr.2d 716], a case cited by Lepolo, the appellate court concluded that vandalism involved moral turpitude. It noted that the crime required the defendant to act “ ‘maliciously,’ ” which “ ‘import[s] a wish to vex, annoy, or injure another person, or an intent to do a wrongful act ....’” In addition, “ ‘there must be a wanton and wilful (or “reckless”) disregard of the plain dangers of harm, without justification, excuse or mitigation.’ ”
 
 {Ibid.)
 

 Finally, in
 
 People
 
 v.
 
 Dewey
 
 (1996) 42 Cal.App.4th 216 [49 Cal.Rptr.2d 537], fleeing or attempting to elude a pursuing officer by driving a vehicle in willful or wanton disregard for the safety of persons or property, with the
 
 *91
 
 intent to evade, was held to involve moral turpitude. The Court of Appeal concluded, “‘Wantonness’ is defined as having ‘consciousness of conduct, intent to do or omit the act ... , realization of the probable injury to another, and reckless disregard of the consequences.’ [Citation.] In the context of reckless driving, the term ‘willful’ refers to the intentional disregard for safety. [Citation.] ... [^Q In holding that escape or attempted escape without force or violence . . . is a crime of moral turpitude, the court . . . [concluded that it] . . . involve[s] inherent dangers to personal safety . . . . It . . . creates an obvious potential for violence .... [T]he court reasoned that ‘[a] defendant who was willing to expose himself and others to the potential for physical harm . . . may be equally [well] motivated and prepared to violate a testimonial oath in order to escape conviction.’ [Citation.]
 
 [%
 
 Similarly, a defendant consciously places the safety of others in jeopardy when driving with the intent to evade a pursuing officer and with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing officer. [The offense] ‘. . . carries with it as a likely consequence the possibility of . . . physical harm . . .
 
 (Id.
 
 at pp. 221-222.)
 

 Lepolo does not here contest the existence of the facts, as stated on the record, which constitute the prior misconduct. The question is, do these facts evince moral turpitude? They do, under the tests stated above and the language employed in the cases cited above. Even if we were to view Lepolo’s conduct narrowly, as constituting merely brandishing a weapon, Lepolo cites no authority holding that even the least adjudicated elements of brandishing do not involve moral turpitude. Therefore, we cannot agree with Lepolo that the trial court’s conclusion in this regard was error.
 

 Lepolo contends that even if his misconduct involved moral turpitude, the trial court abused its discretion in admitting the brief reference to it. In this regard, Lepolo contends only that “wav[ing] a machete in the air . . . has very little bearing on appellant’s veracity .... [I]n light of the prejudicial nature of the conduct.... and the slight probative value of the evidence, the trial court should have exercised its discretion to exclude the evidence.”
 

 However, Lepolo did not just wave a machete in the air. He threatened the officer, causing the latter, and two other officers, to draw their weapons and point them at him. He thus created an extremely dangerous situation in which either he, one of the officers, or, perhaps, even an innocent bystander could have been harmed. Afterwards, he clearly stated that it was his intent at the time he threatened the officer and displayed his machete to “whack [the officer’s] head off.” He thereafter insisted that he planned to harm the officer by using either a gun or a machete. These activities have more than “little” bearing on Lepolo’s veracity. The prejudicial impact of the misconduct was kept to a minimum by the manner in which it was introduced to the
 
 *92
 
 jurors and by the instruction directing that they may consider such evidence only in assessing Lepolo’s credibility, but that it did “not necessarily destroy or impair his believability.”
 
 [6]
 
 Certainly, Lepolo’s bare-bones assertions fall short of sustaining his heavy burden of showing that the trial court acted unreasonably in admitting the evidence, and this resulted in a manifest miscarriage of justice. (See
 
 People
 
 v.
 
 Jordan
 
 (1986) 42 Cal.3d 308 [228 Cal.Rptr. 197, 721 P.2d 79];
 
 People
 
 v.
 
 Stewart
 
 (1985) 171 Cal.App.3d 59 [215 Cal.Rptr. 716].)
 

 b.
 
 Autopsy
 
 Photos
 
 *
 

 3., 4.
 
 *
 

 Disposition
 

 The judgment is affirmed.
 

 Richli, J., and Ward, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied August 27, 1997.
 

 [1]
 

 Lepolo had met this man only once before this night.
 

 [2]
 

 Along that particular stretch of Chicago Avenue, the speed limit was 40 miles per hour.
 

 *
 

 See footnote,
 
 ante,
 
 page 85.
 

 [4]
 

 This occurred a little over five months and three weeks before the victim was killed.
 

 [5]
 

 Penal Code section 422 provides, in relevant part: “Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution . . . shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state . prison.”
 

 [6]
 

 Lepolo contends that this instruction was deficient because the jurors were never told that the incident involving the City of Orange officer was a misdemeanor. The instruction began, “Evidence has been introduced for the purpose of showing that defendant . . . engaged in past criminal conduct amounting to a misdemeanor.” Since no evidence other than this incident was ever introduced at trial concerning Lepolo's past conduct, it may be assumed that the jury knew the instruction referred to it. Additionally, the instruction goes on to provide, “The fact that [Lepolo] engaged in past criminal conduct amounting to a misdemeanor, if it is established, does not necessarily destroy or impair his believability. It is one of the circumstances that you may take into consideration in weighing . . . [Lepolo’s] testimony. . . .” The import of the instruction, taken as a whole, was that the operative words were not “misdemeanor,” but “past criminal conduct.” Certainly, Lepolo cannot contend that the jury would not have understood that this related to the incident at issue. Finally, if Lepolo wished the instruction to be more explicit in this regard, he should have requested an appropriate modification. (See
 
 People
 
 v.
 
 Alvarez
 
 (1996) 14 Cal.4th 155, 222-223 [58 Cal.Rptr.2d 385, 926 P.2d 365];
 
 People
 
 v.
 
 Johnson
 
 (1992) 3 Cal.4th 1183, 1232 [14 Cal.Rptr.2d 702, 842 P.2d 1].)
 

 *
 

 See footnote,
 
 ante,
 
 page 85.