Filed 12/23/14  P. v. Blevis CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C070787 |
| Plaintiff and Respondent, | (Super. Ct. No. 62108490) |
| v. | |
| TYLER DAVID BLEVIS, | |

A jury found defendant Tyler David Blevis guilty of threatening to commit a crime that would result in death or great bodily injury.  (Pen. Code, § 422.)[1]  He was sentenced to state prison for two years and was awarded 220 days' custody credit and 110 days' conduct credit.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offense.

On appeal, defendant contends (1) insufficient evidence supports his conviction, (2) principles of equal protection entitle him to additional conduct credit, and (3) the rule of lenity entitles him to the additional credit.

We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### Prosecution Case

On August 22, 2011, defendant was in the Placer County Psychiatric Health Facility in Roseville. He had initially been placed on a 72-hour hold because he had told police that he was going to commit suicide by jumping off a bridge. The facility instituted proceedings to extend defendant's stay involuntarily and to administer medications that he had refused to take. The facility psychiatrist, Dr. Sarah Altschuler, expressed concern that defendant had been suffering from one or more of the following: bipolar disorder, substance abuse and dependency, and antisocial personality disorder. The last of these three possibilities was the most probable.

Dr. Altschuler believed that defendant should not be released because he was unable to take care of himself. At a hearing held in the morning to extend defendant's stay at the facility, Dr. Altschuler testified in conformity with her opinion. As a result, it was ordered that defendant's stay would be extended and that he would be forcibly medicated. Defendant became enraged, frustrated, and angry over being held and "stormed off" to his room.

At approximately 4:00 p.m. that afternoon, defendant walked up to the nurses' station where Dr. Altschuler was situated in the nurses' station behind a Dutch door that was closed on the bottom and opened on the top. The closed portion was about waist high. It was not locked. Defendant pointed to Dr. Altschuler and repeatedly yelled, "I'm going to kill [her]." Dr. Altschuler recalled that he yelled this "dozens, multiple times" and he pointed his finger at her as he yelled the threat to take her life. He also stated he

2

knew how to get off of the unit.[2] Additionally, he proclaimed he would rather go to jail than stay at a mental hospital. The tone of defendant's voice was agitated, angry, and loud. He took an aggressive stance and was "kind of lunging forward towards the nurse's station." The staff attempted to de-escalate the situation by asking defendant to calm down and step away. Defendant responded by screaming more loudly.

Elizabeth Roccucci, the director of social services, telephoned the police to report defendant's threat. Meanwhile, defendant used the pay telephone to contact authorities and report his own conduct. He was still yelling. He told the police he would rather go to jail than remain in the mental facility.

The recordings of the telephone calls to the authorities were played for the jury. Defendant told the dispatcher that he was "at the mental hospital" and that he had "just threatened to kill somebody." Defendant added, "I already done lost it, and I plan on like getting somebody real fucking good. So, you guys need to make it out here ASAP."

Roccucci told the dispatcher that defendant wanted to kill their psychiatrist, Dr. Altschuler. Roccucci explained that they were doing their "best to kind of keep things under control."

After his call to law enforcement, defendant continued to make threats. He walked back to the half open Dutch door and threatened to jump into the nurses' station area. The staff then closed the upper portion of the door and tried to isolate Dr. Altschuler from defendant to protect her.

Dr. Altschuler believed that, if defendant remained in the mental health facility, he would carry out his threat by harming her or someone else on the staff. She explained that she took him seriously, and she was afraid because of his conduct and statements.

---

[2] Defendant points out that Dr. Altschuler's testimony was inconsistent with what she wrote in her discharge report, in that she wrote that defendant first said, " 'I know how to get off the unit' " before he began threatening her. This inconsistency is inconsequential.

3

She believed that, if he did not get his way, he would hurt someone. At the time of the threats, Dr. Altschuler was 15 or 16 weeks pregnant. She acknowledged that defendant made the threats as a means of getting out of the unit. However, as of the time of trial, Dr. Altschuler thought defendant was still upset with her and as a consequence, she was still afraid of defendant.

After his arrest, defendant explained that when he learned that he would be detained in the mental health facility for two additional weeks and forcibly medicated, he decided to threaten the doctor so that he could get out of the mental health facility and go to jail.

### Defense Case

Defendant testified on his own behalf. He agreed that he had threatened Dr. Altschuler but denied that it was his intention to kill her. Rather, he threatened her only to get transferred from the mental health facility to the jail. Defendant had no clear recollection of exactly what he had said.

### DISCUSSION

### I. Insufficient Evidence Contention

Defendant contends his due process rights were violated because insufficient evidence was produced at trial to support his conviction of criminal threats. Specifically, defendant argues there was no evidence that he was likely to carry out his threat to kill Dr. Altschuler, and there was insufficient evidence that she was placed in reasonably sustained fear. We disagree.

### A. Standard of Review

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable,

4

inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

## B. Analysis

### 1. Elements of Criminal Threats

"In order to prove a violation of section 422, the prosecution must establish…: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement…is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat--which may be 'made verbally, in writing, or by means of an electronic communication device'--was 'on its face and under the circumstances in which it [was] made,…so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228, citing § 422 & *People v. Bolin* (1998) 18 Cal.4th 297, 337-340 & fn. 13; see *People v. Maciel* (2003) 113 Cal.App.4th 679, 682-683.) The totality of surrounding circumstances must be examined when evaluating threats for sufficiency under section 422. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

"A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution[.] [S]ection 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)

The immediacy requirement is met so long as the threat and surrounding circumstances convey an immediate prospect of execution to the victim. (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157 (*Stanfield*).) Conditional threats are sufficient if their context leads the victim to believe that they are intended. (*People v. Brooks* (1994) 26 Cal.App.4th 142, 149 (*Brooks*).) Aggressive posturing and actions by the defendant can be considered in determining whether a statement constitutes a criminal threat. (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 88-90 (*Lepolo*).)

"Sustained fear" has a subjective component and an objective component. (*In re Rickey T.* (2001) 87 Cal.App.4th 1132, 1140.) The victim must actually be in fear and that fear must be reasonable under the circumstances. (*Ibid.*) The fear must extend beyond that which is momentary, fleeting, or transitory. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

### 2. Likelihood of Carrying Out the Threat

Defendant first contends that, under the circumstances, he "was not prepared to do any more than shout threats. There is simply no evidence upon which a rational trier-of-fact could base an inference that [he] was likely to carry out his threat to kill the doctor." While section 422 requires that the threat be "so unequivocal, unconditional, immediate, and specific *as to convey to the person* threatened, a gravity of purpose and *an immediate prospect of execution*," it does not require a showing of a likelihood that the threat would be carried out. (Italics added.)

As the People note, section 422 punishes a qualifying threat, " ' "even if there is no intent of actually carrying it out." ' " (§ 422, subd. (a); *People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) Whether defendant was "prepared to do any more than shout threats" was not relevant.

Defendant's intent that his statement be taken as a threat, and the immediacy and gravity of purpose, were amply shown here. Defendant walked right up to the half open Dutch door to the room where Dr. Altschuler was situated and repeatedly told the doctor

6

that he was going to kill her. His mannerisms and tone conveyed that his purpose was serious. He yelled and screamed the threats "dozens" of times while pointing at Dr. Altschuler. He also exhibited an aggressive stance and posture toward the doctor. He was, in fact, very angry at the time. There was sufficient evidence that defendant's statements were intended to be threats and that those threats conveyed a gravity of purpose. (*Stanfield*, *supra*, 32 Cal.App.4th at p. 1157; *Brooks*, *supra*, 26 Cal.App.4th at p. 149; *Lepolo*, *supra*, 55 Cal.App.4th at pp. 88-90.)

Defendant's conduct after the first salvo of threats reinforced the seriousness of the situation. Defendant urged the staff at the mental health facility and the police to take him seriously. He said, "I already done lost it, and I plan on like getting somebody real fucking good."

Defendant claims his threats did not convey an immediate prospect of execution (*Stanfield*, *supra*, 32 Cal.App.4th at p. 1157; *Brooks*, *supra*, 26 Cal.App.4th at p. 149; *Lepolo*, *supra*, 55 Cal.App.4th at pp. 88-90) because he did nothing to indicate he was prepared to carry out the threat; he did not get try to get through the half open Dutch door or pick up an object to use as a weapon. Thus, according to defendant, "there was little, if any, likelihood that [he] would ever get close enough to physically harm the doctor or her unborn child." He states that Dr. Altschuler was inside the nurses' station, behind a closed door, and trained staff were endeavoring to protect her. But as this court long ago recognized, the prosecution need not show an immediate ability to carry out the threat. (*In re David L.* (1991) 234 Cal.App.3d 1655, 1660.) The focus of the immediacy element is not an actual likelihood that the threat would be carried out, but whether the threats and circumstances conveyed to the person threatened an immediate prospect of execution. "Section 422 requires only that the words used be of an immediately threatening nature and convey 'an immediate *prospect* of execution.' " (*Id*., original italics.) The circumstances defendant references did not allay Dr. Altschuler's fears. She believed that, if defendant remained in the mental health facility, he would carry out his threat by

7

harming her or someone else on the staff.  Dr. Altschuler was not required to believe that the nurses' station, the closed door, or staff could assuredly protect her then or that she would be protected indefinitely once she resumed her duties at the facility.

### 3.  The Victim's Fear

Defendant claims "there was insufficient evidence to support a finding that Dr. Altschuler was reasonably in 'sustained fear.' " (*People v. Toledo*, *supra*, 26 Cal.4th at pp. 227-228.)  He acknowledges that she testified that she was frightened; and that, under the applicable standard of review, her testimony must be deemed to be credible.  But defendant claims "there is no evidence that the fear was more than momentary."  We disagree.

Dr. Altschuler testified at trial that she was "still concerned about" defendant and "what he would do if he were to leave," in that "he's probably quite upset with [her] and at the outcome of what happened that day."  This testimony, along with the other circumstanced, allowed the fact finder to infer that her fear was more than momentary.

Defendant claims that, even if Dr. Altschuler truly felt sustained fear, the evidence does not support a finding that her fear was reasonable.  We disagree.

Dr. Altschuler knew that defendant was being held in the mental health facility because he expressed an intention to do violence to himself.  Dr. Altschuler also knew that defendant was unwilling to take his medications and was very upset over being held longer than he wanted to stay in the facility.  She knew that defendant had been convicted of a felony and had been to prison and was of the opinion that defendant had antisocial personality disorder.  In addition, Dr. Altschuler was 15 or 16 weeks pregnant, which contributed to her fear and increased her vulnerability.  As noted, she testified that she was afraid of defendant and remained afraid of him at the time of trial.  Under all these circumstances, the trier of fact could conclude that Dr. Altschuler's sustained fear of defendant was reasonable.  (*People v. Boyer*, *supra*, 38 Cal.4th at pp. 479-480; *People v. Allen*, *supra*, 33 Cal.App.4th at p. 1156.)

8

Defendant makes much of the fact that Dr. Altschuler did not order him to be restrained. But Dr. Altschuler explained this in her testimony, and the jury was entitled to believe her explanation. Dr. Altschuler testified that after the police were called, she briefly discussed with staff whether they should apply restraints to control defendant. They concluded it would not be appropriate, because his acting out was not due to mental illness, which is a prerequisite for using the physical restraints. Dr. Altschuler also testified that often the best strategy for dealing with combative mental health patients is for the target of the aggression to back away and let other staff deal with the individual. She also explained that they try very hard not to use the physical restraints.

Defendant counters that Dr. Altschuler's opinion that restraints would be inappropriate is "inherently inconsistent" with her stated belief that defendant would harm her, her unborn child, or facility staff. In his view, if Dr. Altschuler "genuinely believed that he posed a danger," there was "no reason not to direct her staff" to restrain him and "[n]o one would fault her for placing [defendant] in restraints if she truly believed that he formed a risk of causing death or serious injury." Defendant offers no support for the notion that Dr. Altschuler would not be faulted for breaking protocol. And the jury could credit her testimony regarding the appropriateness of adhering to the protocol for when restraints should be used. There was substantial evidence that Dr. Altschuler's fear of defendant was reasonable.

## II. Conduct Credits

### A. Equal Protection

Defendant contends principles of equal protection entitle him to earn presentence conduct credit at the rate prescribed by current section 4019 for the portion of his incarceration served between October 1, 2011, and the date of sentencing. We disagree.

Our high court in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*) concluded that prospective application of Senate Bill No. 18, a prior version of section 4019, did not violate principles of equal protection. (*Id.* at pp. 322, 328-330.) The court reasoned that

9

the incentive purpose of the law -- to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in custody -- had no application to those who were in custody prior to the effective date because they could not have been motivated to modify their behavior to earn credits allowed by a law of which they were not aware. (*Id.* at p. 329.) In *People v. Lara* (2012) 54 Cal.4th 896, the court more recently concluded the Legislature did not violate equal protection by making its 2011 amendment of section 4019 expressly prospective. (*Lara*, at p. 906, fn. 9; § 4019, subd. (h).) Defendant nevertheless makes an equal protection claim regarding the 2011 amendment.

Defendant contends equal protection is violated where, as here, defendants in presentence custody *after October 1, 2011*, earn different rates of conduct credit depending on *whether their offense occurred* prior to that date. He acknowledges he is entitled to credits at the former rate for his presentence custody time served before October 1, 2011, but asserts he is entitled to the more generous rate for precustody time served after that date.[3] We disagree.

Defendant's argument has been repeatedly rejected, albeit for a variety of reasons. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 53-56 (*Rajanayagam*) [defendants who are in presentence custody after October 1, 2011, are similarly situated regardless of whether their crime was committed before or after that date, but the classification nevertheless bears a rational relationship to cost savings purpose of the change in the law]; *People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397 (*Kennedy*) [the two groups are not similarly situated, and the classification is rationally related to a policy of preserving the deterrent effect of the criminal law as to crimes committed before October 1, 2011, as well as the legislative intent to strike a balance between reducing the prison

---

[3] Defendant remained in presentence custody until March 28, 2012, when he was sentenced.

population during the state's fiscal emergency and protecting public safety]; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1551-1552 (*Ellis*) [defendant's contention that he was entitled to the new credits for pretrial custody time served before and after October 1, 2011, was rejected because his group is not similarly situated to defendants who commit their crimes on or after that date].)  We also reject the argument defendant advances.

The People point out that defendant's class is not similarly situated to the class of defendants who commit their crimes on or after October 1, 2011.  Pretrial detainees, such as defendant, could not be motivated to change their custodial behavior even after the effective date because section 4019, subdivision (h), clearly says that the change in the law applies prospectively and they are not entitled to the enhanced credits.  In this respect, defendant and others in his class are like the defendants in *Brown*, whose past good behavior could not have been motivated by a law that did not yet exist.  We agree. The only difference between defendant's class and the class of defendants in *Brown* is that pretrial detainees in defendant's class may very well know about the enhanced credits for pretrial custody after October 1, 2011, but they also know that according to the express language of the law, they not eligible.  Thus, there is no motive to modify their behavior to obtain the enhanced credits.

Even assuming defendant is in presentence custody after October 1, 2011, are similarly situated regardless of whether they committed their crime before or on or after that date, under the very deferential rational relationship test, defendant's constitutional challenge fails. (*Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 55-56.)  The classification is rationally related to the cost savings purpose of the change in the law and the need to strike a balance between reducing the prison population during the state's fiscal emergency and protecting public safety. (*Id.*)  And it is likewise rationally related to the legitimate interest of maintaining the deterrent effect of previously enacted criminal sanctions by carrying out the originally prescribed punishment. (*Kennedy*, *supra*, 209 Cal.App.4th at pp. 396-397.)

11

## B. Rule of Lenity

Defendant contends that pursuant to the rule of lenity, the presentence conduct credit formula of present section 4019 should be applied to the portion of his custody that occurred after October 1, 2011.  He relies on section 4019, subdivision (h), which states in full:  "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011.  *Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law*."  (Italics added.)

Defendant contends that by expressly declaring that days earned *prior* to October 1, 2011, shall be calculated pursuant to *prior* law, section 4019, subdivision (h)'s second sentence *implies* that days earned *after* October 1, 2011, shall be calculated pursuant to *present* law, even if the offense occurred prior to that date.  Because this purported *implication* conflicts with the subdivision's first sentence, which states that present section 4019 "shall apply prospectively" to offenses on or after October 1, 2011, rather than to offenses prior to that date, defendant asserts that the rule of lenity requires us to resolve this conflict in his favor.  We disagree.

The rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute.  (*People v. Manzo* (2012) 53 Cal.4th 880, 889 (*Manzo*).)  "Rather, the rule applies ' "only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule." ' [Citation.]  In other words, 'the rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in *relative equipoise....*' " ' [Citation.]"  (*Manzo*, at p. 889, first italics in original, second italics added.)

Like defendant's other arguments concerning credits, the rule of lenity argument has also been rejected.  "The rule of lenity is inapplicable because there is no ambiguity

12

in section 4019 as effective October 1, 2011." (*People v. Miles* (2013) 220 Cal.App.4th 432, 436.)

First, the two sentences in section 4019, subdivision (h), are not in "relative equipoise." (*Manzo*, *supra*, 53 Cal.4th at p. 889.) Like the court in *Rajanayagam*, we read the second sentence in section 4019, subdivision (h), "as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law," not that such defendants who remain in custody are entitled to the new conduct credits for presentence custody on or after that date. (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 52; accord *Ellis*, *supra*, 207 Cal.App.4th at p. 1553 [second sentence merely specifies the rate at which defendants other than those who commit their crimes on or before October 1, 2011, are to earn credits].)

Second, defendant's argument overlooks section 4019, subdivision (g), which states: "The changes in this section *as enacted by the act that added* this subdivision shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after the effective date of that act." (Italics added) The "act that added" section 4019, subdivision (g), was Senate Bill No. 76, effective September 28, 2010. (Stats. 2010, ch. 426, § 2.) Section 4019, subdivision (g), thus provides that the credit formula of Senate Bill No. 76 applies to persons, like defendant, who are "confined…for a crime committed on or after" September 28, 2010. Because defendant committed his crime on August 22, 2011, his conduct credit must be calculated pursuant to the formula of Senate Bill No. 76. As defendant concedes, Senate Bill No. 76 did not entitle him to day-for-day conduct credit because his offense is a serious felony. (§§ 422, 1192.7, subd. (c)(38).) Rather, it entitled him to two days' conduct credit for every six-day period of confinement. (Stats. 2010, ch. 426, § 2; former § 4019, subs. (b) & (c).)

We conclude that the rule of lenity does not apply.

13

## DISPOSITION

The judgment is affirmed.

      MURRAY      , J.

We concur:

      HULL      , Acting P. J.

      ROBIE      , J.