Filed 3/25/16  P. v. Pinto CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041173 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1240019) |
| v. | |
| MARCO PINTO, | |
| Defendant and Appellant. | |

At a Fourth of July celebration in 2012, defendant Marco Pinto stabbed his brother Rui Pinto three times in the chest and neck.  At trial, the jury hung on a charge of attempted murder but found defendant guilty of assault with a deadly weapon.  The jury also found true an allegation that defendant personally inflicted great bodily injury on the victim.  The trial court found allegations that defendant had suffered a prior strike conviction, had suffered a prior serious felony conviction, and had served a prior prison term to be true.  The court sentenced defendant to a total term of 16 years in prison.

On appeal, defendant challenges the trial court's exclusion of evidence proffered to show that the victim, who testified at trial, had violated a restraining order.  We conclude the trial court did not abuse its discretion by excluding this evidence.  Accordingly, we will affirm the judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Facts of the Offense*

On July 4, 2012, defendant's older brother, Rui Pinto, was celebrating the holiday with family members at his house in San José. Those present included defendant, who had moved into Rui's house to share the living expenses; Fernando Batres (Rui's nephew); Emily Pinto (Rui's then nine-year-old daughter); and Mikey Pinto (Rui's four-year-old son).[1] Rui had bought fireworks, and the group was setting them off in the area outside Rui's house.

At around 10:30 p.m., Batres called 911 to report that Rui had been stabbed. Police arrived to find Rui suffering from multiple stab wounds in the neck and upper body area. At trial, defendant did not dispute that he had stabbed Rui, but he argued that the prosecution failed to disprove self-defense, imperfect self-defense, and heat of passion.

### 1. *Testimony of Fernando Batres*

Fernando Batres, 22 years old at the time of trial, testified as follows. Rui had been married to Batres' aunt. Batres had known Rui for 14 or 15 years, and he considered Rui a close relative. Batres also knew defendant, but they were not close.

On July 4, 2012, Batres and his girlfriend went to Rui's house to celebrate the holiday. They arrived at around 8 p.m. Everybody was outside enjoying the fireworks. Batres stayed outside the entire time. Defendant did not appear to be intoxicated and Batres did not see defendant drinking anything.

About two hours later, when the fireworks were over, Batres and his girlfriend decided to leave. Batres shook defendant's hand, hugged Rui and his children, and told them goodbye. Batres then walked to his car in the street and began driving away with his girlfriend. As he was driving past Rui's house, Batres saw Emily screaming and

---

[1] We will generally refer to Rui Pinto and his children by their first names to avoid confusion.

running toward his car. Emily was scared and crying, and she told Batres to call 911 because "my daddy's bleeding." Batres immediately stopped, got out of his car, and ran towards Rui's house. Mikey came out of the house crying. Batres told his girlfriend to take the children to his car.

Rui's front door was open. As Batres approached, he saw defendant and Rui standing just inside. Rui, standing closest to the door, was facing outside towards Batres. Defendant was standing just behind Rui. Batres testified, "And you know, like I seen [defendant] with something like hidden stabbing my uncle in the back." While giving this testimony, Batres mimicked a stabbing motion by raising his right hand and lowering it. He testified that defendant stabbed Rui around the back of his neck or lower back. Batres could not see what defendant had in his hand, but he testified he saw "something pointy."

Defendant then went to his room inside the house, and Rui walked outside to sit on the steps of the porch. Batres asked Rui what had happened, but Rui did not respond. Rui appeared pale, and he said he could not breathe. Rui had blood on him everywhere, particularly his neck. At that point, defendant came out of the house and walked toward the street. Batres could see a pointy object in his hand. Batres testified it looked "like scissors, like a knife," and it had "the same structure as scissors and knives. Pointy." Batres asked defendant what happened, but defendant did not respond and kept walking toward his car. Batres did not see any injuries on defendant. Defendant got into his car and drove away, "burning rubber." At that point, Batres called 911. An audio recording of the call was played for the jury. The police arrived 10 or 15 minutes after the 911 call.

2. *Testimony and Statements of Rui Pinto*

Rui Pinto testified as follows. On July 4, 2012, he began drinking beer first thing in the morning. His plans for the day included having the kids over and setting off the fireworks he had purchased. He could not recall how many beers he had consumed by the time the fireworks started. When asked about various events of the day, Rui

3

repeatedly testified that he could not remember what happened. He claimed that he had blacked out from alcohol consumption, and that the next thing he recalled was waking up in the hospital. He could not recall telling the police when they arrived that defendant had stabbed him that night.

The prosecution questioned Rui about his prior testimony at the preliminary hearing. Rui admitted previously testifying that defendant had stabbed him after a fight over whether Rui would purchase more beer. He admitted testifying that defendant arrived at the party with a 30-pack of Tecate beer. And he had testified that defendant kept insisting that he (Rui) buy more beer, but he refused to do so because he was short on money. Rui had also testified that he was walking away from defendant when defendant stabbed him. Rui repeatedly claimed he could not recall these events when he testified at trial.

The prosecution called two San José police officers to testify about prior statements Rui had given them concerning the stabbing. Officer Mark Alvares testified that he was dispatched to Rui's house on the night of the stabbing. He found Rui sitting on the porch bleeding. At first, Rui would not tell him what had happened. Later, Rui said he and defendant had gotten into a "physical altercation" over who would buy more beer.

San José Police Officer Michael Villanueva subsequently spoke with Rui on July 11, 2012. Rui stated to Officer Villanueva that defendant had stabbed him. At the time, however, Rui did not want to pursue charges against defendant, so Officer Villanueva closed the case. But on July 17, Rui recontacted Officer Villanueva and said he wanted the investigation to continue. Officer Villanueva recorded the phone call, the audio of which was played for the jury. In the call, Rui said he changed his mind about pursuing charges after "reality started coming" and he came to realize the "viciousness of the attack," in which defendant tried to kill him in front of his children. Rui stated there had been no confrontation or argument and that defendant had "broadsided" him. Rui

4

recalled defendant had insisted Rui buy more beer, but Rui only had $60 and had been paying all the bills, so he refused and started walking away. Rui was at the front door about to walk outside when defendant began stabbing him. As Rui was lying on the floor, he saw defendant walk away with a knife or some object in his hand.

When the prosecutor confronted Rui at trial with his prior out-of-court statements, Rui repeatedly disavowed them as the product of his own anger and confusion. He claimed his prior statements about what had happened were based on rumors he had heard from family and friends.

3. *Testimony of Emily Pinto*

Emily Pinto (Rui's daughter) was 13 years old at the time of trial. She testified as follows. On July 4, 2012, she spent the day with the neighbors' children outside in front of Rui's house. She did not remember defendant or Rui drinking any alcohol.

After the fireworks were over, Emily decided to go inside the house to get something to drink. She saw defendant and Rui talking by the front door, so she did not go in. She saw defendant push or shove Rui, and she heard Rui say, "[N]o, I got my kids here, I can't." Emily thought defendant and Rui were going to get into a fight and she did not want to see it, so she started backing away. After standing outside "for a little bit," she saw Rui come out of the house bleeding. Emily, shocked, went to find Batres to tell him Rui was bleeding. Batres got out of his car to attend to Rui while Batres' girlfriend took Emily and Mikey across the street. Emily then saw defendant walking to his car. She did not see anything in his hands.

4. *Other Evidence*

The physician who treated Rui testified that Rui had suffered one stab wound to his left chest and two stab wounds at the base of his skull near his left ear. The stabbing to the chest had punctured the lining of the left lung and had caused the lung to collapse. One of the wounds at the base of the skull was a superficial laceration located just behind the left ear. The other laceration, below Rui's left ear, was much more serious. Based on

5

the shape of the wound, the physician opined that the lacerating object was moving in an upward trajectory. The object damaged blood vessels at least four inches into the base of the skull, including the carotid artery and the jugular vein. The damage required a highly unusual surgical procedure involving the placement of a stint into the carotid artery. Rui will have to be monitored by a physician for the rest of his life, and he is at elevated risk of a stroke. A sample of Rui's blood taken at the hospital exhibited a blood alcohol level of 0.023 percent.

In 2013, the United States Marshal's Office found defendant in New Jersey and took him into custody.

B. *Procedural Background*

In the third amended information (the operative charging document), the prosecution charged defendant with two counts: Count One—Attempted murder (Pen. Code, §§ 187, 664, subd. (a))[2]; and Count Two—Assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)). As to both counts, the information alleged defendant personally inflicted great bodily injury on the victim during the commission of the offense. (§ 12022.7, subd. (a).) The information further alleged defendant had suffered a prior violent or serious felony conviction (§ 667, subd. (b)-(i)), had suffered a prior serious felony conviction (§ 667, subd. (a)), and had served a prior prison term (§ 667.5, subd. (a)).

The case proceeded to trial in February 2014. The jury hung on Count One (attempted murder) but found defendant guilty on Count Two (assault with a deadly weapon). The jury found true the allegation that defendant had personally inflicted great bodily injury on the victim in the commission of the offense. In a bifurcated proceeding, the trial court found true the allegations that defendant had suffered a prior strike

---

[2] Subsequent undesignated statutory references are to the Penal Code.

conviction, had suffered a prior serious felony conviction, and had served a prior prison term.

The trial court imposed a total term of 16 years in prison, equal to eight years (double the upper term of four years) for Count Two, plus three years for the great bodily injury enhancement and five years for the prior serious felony conviction. The court stayed the term of three years for the prior prison term under *People v. Jones* (1993) 5 Cal.4th 1142.

## II. DISCUSSION

Defendant contends the trial court erred by excluding evidence that Rui Pinto had a pending misdemeanor charge for violating a restraining order. Defendant argues Rui's conduct constituted a crime of moral turpitude and therefore should have been admitted for impeachment purposes. The Attorney General responds that the asserted conduct was not a crime of moral turpitude, but that even if the conduct involved moral turpitude, the court properly excluded the evidence under Evidence Code section 352. We conclude the trial court did not abuse its discretion by excluding the evidence.

A. *Procedural Background*

The prosecution moved in limine to exclude evidence that Rui was arrested on December 18, 2013, allegedly for violating a restraining order prohibiting contact with his neighbors. The prosecution argued that the alleged offense did not constitute a crime of moral turpitude and was therefore irrelevant. The prosecution also anticipated that Rui would invoke his Fifth Amendment right to remain silent if he were questioned about the incident, which would require calling other witnesses to testify about it. The prosecution argued that the evidence should be excluded under Evidence Code section 352 because litigation of the facts would require an undue consumption of time and would distract the jury. The prosecution also argued that if the court admitted any such evidence of Rui's character for violence, then the prosecution should be allowed to introduce evidence of defendant's prior conviction under Evidence Code section 1103.

7

Defendant opposed the motion. In oral argument, defendant argued that the proffered evidence would consist of "a half-an-hour worth of testimony at the most." Defendant also argued that although the offense was not "per se a crime of moral turpitude," the conduct would amount to a crime of moral turpitude admissible under *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*).

The trial court gave an "indicated ruling" that the evidence would be excluded for impeachment purposes because the alleged offense was not a crime of moral turpitude and any probative value would be outweighed by the undue consumption of time. The court left open the possibility that the evidence could be admitted under Evidence Code section 1103.

The parties subsequently turned to the admissibility of the evidence under Evidence Code section 1103 and whether the conduct showed a character for violence that would support a claim of self-defense. Defendant proffered, "I believe there's at least three victims in that case, the husband, wife, and a child where Rui Pinto is seen by each of them outside of his home, in the same location that our current incident took place,[3] making threatening gestures, yelling threats, and being, frankly, highly aggressive towards them. [¶] There's also a restraining order on file with the same family as the protected parties based on his aggression and violence towards them." Defendant then asserted that a second incident resulted in Rui violating the restraining order. Defendant did not describe the facts of this incident, but stated, "My understanding from reading the police report is that this has been a pattern of ongoing conduct which would be supported by the fact that the court has, in fact, issued a restraining order."

The trial court ruled that the evidence would be admissible under Evidence Code section 1103, but the court admonished defendant that adducing this evidence would

---

[3] Defendant subsequently acknowledged that the incident took place at a different residence.

open the door to evidence of his own prior conviction. Acknowledging this "pitfall," defendant stated that he was unsure whether he would introduce the evidence, but he expressed his desire to retain that option. Defendant then proffered two witnesses who would provide "sufficient evidence to show that [Rui] was aggressively pursuing both the two adult witnesses as well as their minor child." Defendant subsequently declined to call either witness.

When questioned about the incident in a hearing under Evidence Code section 402, Rui asserted his Fifth Amendment right to remain silent.

B. *Legal Principles*

The California Supreme Court has held "that—always subject to the trial court's discretion under section 352—[article I, section 28, subdivision (f) of the California Constitution] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 306.)

In *Wheeler*, *supra*, the California Supreme Court extended this principle to evidence of misdemeanor offenses. "[I]f past criminal conduct amounting to a misdemeanor has some logical bearing upon the veracity of a witness in a criminal proceeding, that conduct is admissible, subject to trial court discretion, as 'relevant' evidence under section 28(d)." (*Wheeler*, *supra*, 4 Cal.4th at p. 295.) "Misconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction. While the trial court may weigh proffered impeachment evidence on its individual merit, there is no basis for a ruling that the court's discretion may never be exercised to admit nonfelonious conduct. [¶] Of course, the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude

9

section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Id.* at pp. 295-296, fn. omitted.)

"In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler*, *supra*, 4 Cal.4th at pp. 296-297, fn. omitted.) Furthermore, immoral conduct may be admissible for impeachment purposes whether or not it produced any conviction, felony or misdemeanor. (*Id.* at p. 297, fn. 7.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court has broad discretion in determining whether to admit or exclude evidence under Section 352. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170.) Rulings under Section 352 will not be overturned absent an abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

C. *The Trial Court Did Not Abuse Its Discretion by Excluding the Evidence of Rui Pinto's Violation of a Restraining Order*

Defendant cites no authority for the proposition that a misdemeanor violation of a protective order constitutes a crime of moral turpitude. Rather, he argues that the offense of making criminal threats, as proscribed by section 422, is analogous to a misdemeanor violation of a protective order. (See *People v. Lepolo* (1997) 55 Cal.App.4th 85 [act of waving a machete at a police officer constituted a criminal threat and hence a crime of moral turpitude]; *People v. Thornton* (1992) 3 Cal.App.4th 419, 424 [criminal threats

10

constitutes a crime of moral turpitude].)  Section 422 provides, in relevant part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat . . . shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

Here, the proffered evidence was that Rui was "making threatening gestures, yelling threats," and was being "highly aggressive" towards the alleged victims.  It is unclear from the proffered facts that Rui's conduct rose to the level of moral turpitude involved in threatening to commit a crime that could result in death or great bodily injury, as required under section 422.  Therefore, the cases relied on by defendant are not persuasive.

Even assuming Rui's conduct amounted to a crime of moral turpitude, the trial court also excluded the evidence under Evidence Code section 352 on the ground that its presentation would require an undue consumption of time.  Rui had never been convicted of any offense in connection with the alleged conduct.  And because he refused to answer any questions about it, defendant would have been required to call witnesses to adduce the relevant evidence.  The trial court ruled that the time required for such a diversion was unwarranted by the comparatively low probative value of the evidence with respect to Rui's credibility.  The trial court was within its discretion with this ruling.

Defendant argues that the ruling was erroneous because the court also ruled that the evidence would be admissible under Evidence Code section 1103, contradicting the finding that presentation of the evidence would have required an undue consumption of time.  But Evidence Code section 352 requires the court to weigh the required consumption of time *against the probative value of the evidence*.  The probative value of evidence depends on the purpose for which it is offered.  Under *Wheeler*, defendant offered the evidence to impeach the witness's credibility.  Under Evidence Code section

11

1103, defendant offered the evidence to prove Rui's character trait for violence. The latter theory of relevance was more probative to the ultimate issue of defendant's guilt.

Defendant admitted to the stabbing. His sole defense was to argue that the attack occurred in self-defense or heat of passion—i.e., because of violent or provocative conduct by Rui. Rui's character trait for violence was therefore highly probative. By contrast, Rui's credibility was not nearly as probative. Indeed, Rui's in-court testimony, if believed, likely would have benefitted the defense. Rui repeatedly denied having any memory of the attack, purportedly due to an alcohol-induced blackout, and he disavowed his prior out-of-court statements as the product of anger and confusion. To the extent Rui's credibility was undermined, it was likely because the jury discredited his own in-court testimony. Such a finding would have been corroborated by the blood alcohol test of Rui's blood after the attack, resulting in a level of 0.023 percent—well below the level at which driving is prohibited. Defendant on appeal focuses solely on the credibility of Rui's out-of-court statements, but defendant does not explain how the proffered evidence would have undermined the credibility of those statements without also undermining the credibility of Rui's in-court testimony.

We conclude the trial court did not abuse its discretion by excluding the proffered testimony under Evidence Code section 352. We also reject defendant's claim that the exclusion of the evidence violated his federal constitutional rights. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we [have] observed [. . .], 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679, quoting *Delaware v. Fensterer* (1985) 474 U.S. 15, 20.)

Finally, defendant argues he suffered ineffective assistance of counsel to the extent trial counsel's objections were insufficient. We do not find—and the Attorney General does not contend—that trial counsel failed to object sufficiently. Accordingly, trial counsel did not render deficient performance.

For the reasons above, we will affirm the judgment.

### III. DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Premo, J.