Filed 5/19/15  P. v. Thompson CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B252528 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA091280) |
| v. | |
| MATHEW ARLIN THOMPSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Tomson T. Ong, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Barbara S. Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Mathew Arlin Thompson and his brother Braden William Thompson (Braden) were tried together on a multi-count information. Braden is not a party to this appeal. The jury found appellant guilty of second degree murder of Kyon Hicks (Kyon) (Pen. Code, § 187, subd. (a);[1] count1), shooting at an inhabited dwelling (§ 246; count 3), and attempted murder of Larry Beasley (Larry) and R.C. (R.) (§§ 664, 187, subd. (a); counts 6 & 7).[2] As to each of these counts, the jury found true the gang allegation (§ 186.22, subd. (b)(1)(c)). As to counts 3, 6 and 7, the jury found true the allegation that a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subds. (c) and (e)(1). The jury acquitted appellant on count 2, attempted murder of Kyoko Carllel (Kyoko). In a bifurcated trial, the trial court found true the prior prison term allegation. Appellant was sentenced to a total term of 140 years to life, as discussed in part V below.

Appellant contends the trial court erred in denying his motions for severance and a new trial, admitting a witness's statement, and in sentencing him. He also contends the evidence was insufficient to support the gang enhancement. We remand the case for the limited purpose of resentencing, otherwise we affirm the judgment.

## FACTS

**Prosecution Case**

### *Events Leading to Murder*

In January 2012, Laverne Alvarez (Nicki) lived in an apartment on the ground floor of an apartment building in the City of Torrance, along with her two-year-old daughter R. (the victim in count 7) and her three other children. Larry (the victim in count 6) is R.'s father. Although Nicki had a restraining order against Larry for domestic violence, he regularly violated it to spend time with the children. Le Porsche Brumfield (Le Porsche) lived in the apartment directly above Nicki's apartment. She and Nicki

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We refer to the victims and witnesses by their first names, purely for ease of reference.

2

were friendly. Larry's mother lived in an upstairs apartment across the hall from Le Porsche.

On the night of January 23, 2012, Larry was at Nicki's apartment taking care of the children while she was at work. He went to the laundry room outside the back door of the apartment to wash clothes. R. was standing in the doorway of the laundry room. Appellant appeared with Le Porsche. Appellant walked up to Larry, "got in [his] face" and twice said, "Tragniew Compton Crip." Larry responded, "All right." Appellant asked Larry where he was "from." Larry said nothing because R. was with him. Larry had seen appellant at the complex before but had never spoken to him, and did not know who he was.

Le Porsche walked up the back stairs to her apartment and appellant followed her, saying something else to Larry. Larry returned to Nicki's apartment with R. He called Nicki, telling her to come home to take care of the children. When she returned home, Larry went upstairs and knocked on Le Porsche's door to "address the situation" with appellant. Le Porsche refused to get appellant. Larry went back downstairs to the front of the building where he could see appellant in the window. Larry called to appellant to come outside, but appellant did not do so. One of Larry's friends came over to Nicki's apartment and talked with Larry for an hour or two. After the friend left, Larry was still upset about appellant confronting him.

### *The Murder*

Sometime before 1:00 p.m. on January 24, 2012, Larry was standing on the porch of Nicki's apartment when he saw his friend Kyon (the victim in count 1) walking down the street. Kyon was with his friend Kyoko (the victim in count 2), whom Larry had not met before. Larry spent about 30 minutes talking with Kyon and telling him about the incident the night before.

Le Porsche then came out onto her balcony and started arguing with Larry. Appellant was also on the balcony. According to Larry, Le Porsche said to him, "I hope you die. Somebody going to kill you." Nicki, who heard the argument from inside her apartment, testified that Le Porsche said, "Stop fucking with me or you are going to get

3

killed." Appellant said nothing during the argument. Larry then went inside Nicki's apartment to help get the children ready to see their grandmother.

Kyon and Kyoko were still outside. Kyoko noticed Braden and an unidentified Black man walking down the street. They walked up the driveway and went upstairs to Le Porsche's apartment. Kyon went to Nicki's apartment to tell Larry about the two men. Shortly thereafter, Braden, appellant and the unidentified third man came downstairs and approached Kyoko. Appellant said to Kyoko, "You was part of them. What you want to do?" Kyoko replied that he had nothing to do with the night before. Appellant hit Kyoko on the chin. Kyoko then heard five gunshots. Kyoko testified that one of the shots hit him on the side of the head. He touched the wound, felt blood dripping, and ran to get help. The three men ran in the other direction. As Kyoko ran, he saw that Kyon had been shot and was lying in the street.

Larry also heard gunshots. He opened the apartment door and R. followed him. Larry saw Braden firing a gun, and said, "Oh, shit. You're shooting." Braden then fired two shots toward Larry and R. Neither shot hit Larry or R.; one shot hit the wall. At some point, Nicki grabbed R. and another baby and fled to the bathroom. Nicki also heard a "big bang on the gate," and then four more gunshots. Appellant and a third man were near Braden at the time of the shooting. Larry saw the three men take off running.

Larry heard someone say that somebody had been hit. He went outside and found Kyon lying down, bleeding. Larry stayed with him until an ambulance and the police arrived. Kyon died from a gunshot wound to the chest.

*Investigation*

The afternoon of the shooting, investigating officers found bullet fragments on the driveway and grass near the front of the apartment building, a fresh nick or scratch on the fence at the front of the property, and blood on the sidewalk near the gate. A single spent round was found near the front door of Nicki's apartment. Also that day, Larry identified appellant from a photographic six-pack as the man he had argued with.

4

On January 31, 2012, Larry again identified Braden from a photographic six-pack as the shooter. He also identified Braden in court as the shooter. Kyoko identified both appellant and Braden at the preliminary hearing.

Law enforcement records listed an address on Clymar Avenue in Compton as Braden's residence, as well as a telephone number beginning with the 424 area code (the 424 phone). On January 31, 2012, Braden was arrested outside that residence and the 424 phone was seized from one of the bedrooms occupied by Braden.

Police officers obtained a search warrant for the phone records of the 424 phone and for a second number beginning with the 323 area code (the 323 phone). A cell tower analysis was done for both numbers.[3] That analysis indicated that on January 24, 2012, the 424 phone was in Compton around 12:20 p.m., and ended up in Torrance at 12:59 p.m. After 1:05 p.m., the phone "pinged" in Torrance, then headed north, "pinged" off towers in Gardena, and ended up back in Compton. On January 24, 2012, the 323 phone was in Torrance from the morning until approximately 1:05 p.m.. The phone then began pinging off towers in a northerly direction heading out of Torrance and pinged off a tower in Gardena. The 323 phone was pinging off the same towers as the 424 phone.

A review of the phone records indicated that on the previous evening, January 23, 2012, between 10:20 p.m. and 11:40 p.m., the 323 phone called the 424 phone 20 times. Of those calls, 15 were answered and five were not. On the morning of January 24, 2012, until about 1:05 p.m., the 323 phone called the 424 phone 16 times. Fifteen of those calls were answered.

### Gang Evidence

Los Angeles County Sheriff's Detective Eric Arias testified as a gang expert. He was familiar with the Tragniew Park Crips gang (TPC), which claimed territory in the southwest portion of Compton. He believed that appellant was a member of the TPC

---

[3]     When a call is made from a cell phone, the cell phone's number bounces or "pings" off a cell tower. The tower records that it "receives a call" from that phone. A cell tower analysis establishes that a phone is in the vicinity of a particular tower.

gang based on appellant's tattoos, other members of the gang identifying appellant as a fellow TPC member, and appellant being identified as a TPC member on a field investigation card.

Detective Arias was also familiar with the Capanella Park Pirus gang (CPP), a Bloods gang which claimed territory north of the TPC gang. He believed that Braden was a member of the CPP gang based on Braden's self-identification as a member, his tattoos, and other members identifying him as a fellow CPP member. The CPP and TPC gangs are rivals, but tolerated appellant's and Braden's rival gang affiliations.

Detective Arias opined that the subject crimes were committed for the benefit of the TPC gang, even though Braden fired the gun, because appellant asserted the TPC gang name in his original confrontation with Larry, Larry's subsequent attempt to confront appellant was a sign of disrespect that needed to be dealt with swiftly so that the gang would not lose credibility, and shooting at someone in broad daylight without a disguise is the "ultimate benefit" that creates fear and intimidation in the community and among rival gangs, allowing the gang to commit further crimes.

Detective Arias explained that in the gang context, the phrase, "Where you from?" is confrontational. It is generally asked of someone suspected of being a member of a rival gang, and anticipates a confrontational response. There is no "right answer" to the question. It is asked to determine whether one will "man up," and claim his gang. When a gang member announces his gang, it is also confrontational.

**Defense Evidence**

Appellant did not testify and presented no evidence on his behalf. Braden's defense is not relevant here.

**DISCUSSION**

## I.  Denial of Motion to Sever Trial

Appellant contends that the trial court's denial of his motion to sever his trial from Braden's denied him due process.

6

## A. Relevant Background

Prior to trial, appellant filed a motion to sever on the grounds that a joint trial would force him to chose between testifying and keeping his brother's name out of the trial and because there was a prejudicial association. At the hearing on the motion, the trial court summarized appellant's grounds as follows: "Your motion to sever is that they are brothers and if your client were to testify in this case, it is very hard for him to do so because then he would be testifying against his brother." Appellant's counsel confirmed "[t]hat's the gist of it, yeah. . . . [¶] . . . His decision to potentially testify is going to be heavily influenced by the fact that his brother is sitting next to him and clearly there is a familial relationship." The prosecutor responded that the "crime is the same exact crime and same charges aside from one charge. The fact that [appellant] chose to get his brother involved in this incident . . . it's like any other case in this county, if there were brothers involved . . . [or] two friends involved . . . "

The trial court denied the motion, stating: "The same facts, same circumstances, there is too much commonality. I understand that one of you may have to tiptoe through the tulips. [Appellant's counsel], if your client decides to take the stand it is not unusual for brothers to be tried together."

## B. Relevant Law

The Legislature has expressed a preference for joint trials. (*People v. Hardy* (1992) 2 Cal.4th 86, 167.) Section 1098 states: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials. . . ." (§ 1098) "But the court may, in its discretion, order separate trials 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People v. Avila* (2006) 38 Cal.4th 491, 574–575.) Generally, it is the rule that a trial court must order a joint trial and separate trials are the "exception." (*People v. Alvarez* (1996) 14 Cal.4th 155, 190, quoting *People v. Massie* (1967) 66 Cal.2d 899, 917; see also § 1098.)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder "'resulted in 'gross unfairness' amounting to a denial of due process.'" [Citation.] Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial." (*People v. Avila, supra*, 38 Cal.4th at p. 575.)

### C. Analysis

In his opening brief, appellant relies on three reasons why the trial court abused its discretion in denying his motion to sever.

One, appellant argues he pointed out to the trial court that his ability to present exonerating testimony at a joint trial would be impaired. Although his brief does not identify any potential testimony he might have given, his severance motion states that it would "behoove" him to testify that he had no idea Braden had a gun or planned to shoot anyone, and added that during cross-examination in a joint trial he would be asked who was the shooter. Appellant seizes on the trial court's comment that his attorney would have to "tiptoe through the tulips" as an acknowledgment by the court that appellant's defense would be negatively impacted by joinder. But appellant would have the same problems during cross-examination in a separate trial. He would have to explain how Braden arrived armed and with another man at the apartment complex where appellant was staying, why appellant confronted Kyoko by asking about the incident the night before and then hitting him, how this all happened to be followed by Braden shooting at people, and why appellant did not try to stop his brother from shooting.

Two, appellant argues his "prejudicial association" with Braden mandated severance. But as our Supreme Court has noted: "'[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they

8

participated in it, vel non. is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.'" (*People v. Hardy, supra,* 2 Cal.4th at p. 169, fn. 19, quoting *Ware v. Commonwealth* (Ky. 1976) 537 S.W.2d 174, 177, quoted in Dawson, Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices (1979) 77 Mich. L.Rev. 1379, 1423.)

Three, appellant argues that the cell phone record evidence would not have been admissible in a separate trial because appellant was never connected to the 323 phone. He claims this evidence against him was irrelevant, inflammatory and exploited by the prosecutor in closing argument. But we cannot conclude that the cell phone evidence was so irrelevant or inflammatory as to be excluded as to appellant. The most obvious and reasonable inference to be drawn from this evidence is that appellant called his brother and asked for his help in dealing with Larry.

Even if the trial court erred in denying the motion to sever, any error was harmless. Indeed, the trial court believed that appellant was more culpable than Braden. The trial court stated during sentencing: "This case, the whole incident was brought about by [appellant] even before [Braden]. The evidence bears out that [appellant] is the one that called . . . out the intended victim at the laundry room . . . . [¶] . . . Then when he was called out from the second floor where [Le Porsche] was located . . . [appellant] cowers and does not come out. What does he do? Instead he calls his brother and got his brother involved. I want to say that the brother is collateral damage. He is more culpable than his brother. He is the one that initiated the fight and coerced, he is the one [who] called his brother. When his brother came over he did not know who was the one that did him wrong. He was the one that had to point out people for his brother to have contact with and, of course, there are other unintended victims." Appellant has failed to demonstrate a reasonable probability that he would have received a more favorable result in a separate trial. (*People v. Avila*, *supra*, 38 Cal.4th at p. 575; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. Admission of Le Porsche's Statement

Appellant contends that the trial court erroneously admitted Le Porsche's statement or threat to Larry and compounded the error by instructing the jurors that they could treat appellant's silence as an adoptive admission.[4]

Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." "'"'There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement." [Citation.]' [Citation.] Admissibility of an adoptive admission is appropriate when "'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .'" [Citation.]" (*People v. Combs* (2004) 34 Cal.4th 821, 843.)

With appellant standing next to her on her balcony, Le Porsche stated to Larry either "I hope you die. Somebody going to kill you" or "Stop fucking with me or you are going to get killed." Appellant said nothing. Le Porsche did not testify at trial. Prior to trial, appellant filed a motion to exclude the statement, which the trial court denied, finding that the statement "circumstantially provides evidence of intent or knowledge."

We agree with appellant that Evidence Code section 1221 is inapplicable here because Le Porsche's threat did not refer to appellant nor accuse him of anything. Thus, appellant had nothing to deny. But we find the statement's admission was harmless error.

---

[4] Appellant argues the statement was inadmissible under both Evidence Code section 1240 (spontaneous utterance) and Evidence Code section 1221 (adoptive admission). The People agree that the statement was not a spontaneous utterance.

10

The jury was specifically instructed with CALJIC No. 2.71.5 that "[u]nless you find that a defendant's silence and conduct at the time indicated an admission . . . you must entirely disregard the statement." We assume that jurors are capable of understanding, correlating and following all of the instructions given, and that they did so. (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 148; *People v. Mills* (1991) 1 Cal.App.4th 898, 918; *People v. Ervine* (2009) 47 Cal.4th 745, 776.) Thus, if "there was nothing for [appellant] to deny" and "the conditions for the adoptive admission exception did not exist," the jury understood that it "must entirely disregard the statement."

Additionally, appellant failed to demonstrate how the exclusion of Le Porsche's statement would have made it reasonably probable that a result more favorable to him would have been reached. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) A defendant's "bare-bones assertions fall short of sustaining his heavy burden of showing that the trial court acted unreasonably in admitting the evidence, and this resulted in a manifest miscarriage of justice." (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 92.) It is unclear how the exclusion of Le Porsche's threat to Larry could have resulted in a more favorable verdict for appellant. She never stated that appellant would do the killing or that he had a gun. The only person with a gun was Braden, who was not present when the statement was made, and whose name Le Porsche did not mention.

## III.  Denial of Motion for New Trial

Following the jury's verdict, appellant moved for a new trial on the grounds that the trial court erred in denying his motions to sever and to exclude Le Porsche's statement. On appeal, appellant argues that the trial court abused its discretion because it did not revisit these issues in the context of the evidence actually produced at trial, but simply incorporated its pretrial reasons for denying the motions. But a review of the reporter's transcript shows that appellant's counsel based the new trial motion by "incorporate[ing] my original arguments involving both issues." Defense counsel stated two more times that he was incorporating the arguments he made in the pretrial motion. Because appellant does not point to any evidence adduced at trial that should have changed the trial court's initial rulings, appellant has failed to establish an abuse of

11

discretion. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 729 ["A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion"].)

## IV. Gang Allegation

Appellant contends that the evidence was insufficient to support jury's true finding on the gang allegation.[5]

"'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The same standard applies to evaluating the sufficiency of the evidence to support a true finding on an enhancement allegation. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 186.22, subdivision (b)(1), provides that "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," shall receive additional punishment. The enhancement therefore has two prongs—the benefit prong and the intent prong. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

---

[5]     Appellant also argues that the jury's true findings on the gang allegations must be stricken because the jury found these allegations not true as to Braden. Appellant deduces that the jury must have found the crimes were not gang related. We draw no conclusions regarding appellant from the jury's findings as to Braden.

12

As to the benefit prong, the gang expert opined that the shooting benefited appellant's gang because appellant asserted the TPC name in his original confrontation with Larry; Larry's subsequent attempt to confront appellant was a sign of disrespect that needed to be dealt with swiftly so that the gang would not lose credibility; and shooting at someone in broad daylight without a disguise is the "ultimate benefit" that creates fear and intimidation in the community and among rival gangs, allowing the gang to commit further crimes. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 63; see also *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138–1139 [§ 186.22, subd. (b)(1) may apply to lone gang member who commits a gang-related crime].)

As to the second prong of the enhancement, all that is required is a specific intent "'to promote, further, or assist in *any* criminal conduct by gang members.'" (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 322, italics added.) Detective Arias opined that the shooting, even though done by Braden, also assisted appellant's gang's criminal conduct because everyone knew the TPC gang was behind the shooting, and the act of shooting in broad daylight creates fear and intimidation and allows the gang to get away with future crimes. "A reasonable jury could infer . . . that appellant intended for the . . . murder to have the predicted effect of intimidating rival gang members and neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members." (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 353; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 208 ["Appellant's argument is unavailing. We first note that Officer Bockrath opined that the crimes in question were, indeed, committed with such intent"].)

## V. Sentencing Errors

Finally, appellant contends that the trial court committed several sentencing errors. The People agree with all but one claimed error. As discussed below, we agree with the parties that the case must be remanded for the limited purpose of resentencing.

13

We first note that appellant was sentenced to a total term of 80 years plus 60 years to life determined as follows:  On count 1, the trial court imposed a term of 15 years to life plus a term of 20 years pursuant to section 12022.53, subdivisions (c) and (e)(1) for a total term of 20 years plus 15 years to life.  On counts 3, 6, and 7, the court sentenced appellant to a consecutive term of 15 years to life pursuant to section 186.22, subdivision (b)(1)(C), plus a term of 20 years pursuant to section 12022.53, subdivisions (c) and (e)(1) for a total term of 20 years plus 15 years to life on each count.

The trial court also assessed a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), and imposed and suspended a parole revocation fine in the same amount pursuant to section 1202.45.  Pursuant to section 1464 and Government Code section 76000, the court imposed a $1,000 assessment and surcharge to be paid to appellant's probation officer in such manner as the officer shall prescribe.  In addition, as to each count, the trial court imposed a court operations assessment of $40, pursuant to section 1465.8, subdivision (a)(1), and a criminal conviction assessment of $30, pursuant to Government Code section 70373.  Pursuant to section 1202.4, subdivision (f), the court ordered appellant to pay restitution fines of $1,784.12 to Kyoko's mother and $5,000 to the Victim's Compensation and Government Claims Board.

### A.  Count 1

Appellant argues, and the People agree, that the trial court imposed an unauthorized sentence on count 1 (second degree murder) by imposing a consecutive sentence of 20 years pursuant to section 12022.53, subdivisions (c) and (e)(1) even though the jury found *not* true all of the firearm allegations against appellant on count 1. Accordingly, on remand the trial court is directed to correct the sentence on count 1 by striking the 20-year firearm enhancement.

### B.  Counts 3, 6 & 7

Appellant argues, and the People agree, that the trial court erred in imposing both gang and firearm enhancements on these three counts.  Section 12022.53, subdivision (e)(2) provides that "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this

subdivision, *unless the person personally used or personally discharged a firearm in the commission of the offense.*" (Italics added.) It is undisputed that appellant was not armed during the offenses and was tried as an aider and abetter. Thus, the parties agree that the trial court should have imposed the 20-year firearm enhancements rather than the 15-years-to-life gang enhancements on counts 3, 6 and 7.

Appellant also points out that the sentence range for the crime of shooting at an inhabited dwelling (count 3) is three, five or seven years. (§ 246.) On remand, the trial court is to exercise its sentencing discretion on count 3. Additionally, because the indeterminate life sentences on counts 6 and 7 were improperly enhanced by adding a minimum eligible parole date of 15 years due to the improper gang enhancement, the trial court is also ordered to change the sentences on counts 6 and 7 to indeterminate life sentences. (§ 12022.53, subd. (e)(2).)

Also with respect to count 3, appellant argues that the sentence should be stayed pursuant to section 654, subdivision (a) because the attempted murders of Larry and R. (counts 6 & 7) were an indivisible course of conduct from the shooting at an inhabited dwelling (count 3). Appellant points out that count 3 named no victims and he asserts that Larry and R. were the only victims of count 3. But appellant ignores the evidence establishing that Nicki was also in the apartment at the time of the shooting. After she heard gunshots, she grabbed R. and another baby and fled to the bathroom. Because there were other victims, consecutive sentencing was appropriate. (*People v. Miller* (1977) 18 Cal.3d 873, 885.)

### C. Monetary Assessment

As noted above, appellant was ordered to pay court operation and criminal conviction assessments and restitution fines. Appellant argues, and the People agree, that the trial court's imposition of a $1,000 assessment and surcharge pursuant to section 1464 and Government Code section 76000 was unauthorized. These statutes levy additional penalties upon every fine, penalty or forfeiture imposed and collected by the courts for all criminal cases. But these statutes expressly state that the penalties they impose do not apply to any restitution fines. (§ 1464, subd. (a)(3)(A); Gov. Code, § 76000, subd.

(a)(3)(A).)  The penalties imposed by section 1464 and Government Code section 76000 also do not apply to the $40 court operations assessment imposed under section 1465.8, subdivision (a)(1) or to the $30 criminal conviction assessment imposed under Government Code section 70373, subdivision (a)(1).  (See § 1465.8, subd. (b); Gov. Code, § 70373, subd. (b).)  Accordingly, upon remand the $1,000 assessment and surcharge must be stricken.

## DISPOSITION

The matter is remanded to the trial court for the limited purpose of resentencing appellant.  Upon remand, the trial court is directed to:  strike the 20-year firearm enhancement on count 1; strike the 15-years-to-life gang enhancements on counts 3, 6 and 7; exercise its sentencing discretion on the sentence range for count 3; modify the sentences on counts 6 and 7 to indeterminate life sentences; and strike the $1,000 assessment and surcharge.  The trial court is then directed to send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
            BOREN


_____, J.
            CHAVEZ

16